**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
Matthew M. Guiney (*pro hac vice*)
Malcolm T. Brown (*pro hac vice*)
Kevin G. Cooper (*pro hac vice*)
270 Madison Ave.
New York, NY 10016
Tel.: 212/545-4600
Guiney@whafh.com
Brown@whafh.com
KCooper@whafh.com

*Lead Counsel for Lead Plaintiff Kui Zhu and the Proposed Class*

**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| KUI ZHU, on behalf himself and all others similarly situated,<br>Plaintiffs,<br>v.<br>TARONIS TECHNOLOGIES, INC., ROBERT DINGESS, SCOTT MAHONEY, ERMANNO P. SANTILLI, KEVIN POLLACK, and WILLIAM W. STAUNTON,<br>Defendants. | No. CV-19-04529-PHX-GMS |

**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

Lead Plaintiff Kui Zhu ("Plaintiff"), individually and on behalf of all other persons similarly situated, by the undersigned attorneys, alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters based upon, *inter alia*, the investigation conducted by and through his counsel, which included, among other things, a review of the defendants' public documents, announcements made by defendants, U.S. Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Taronis Technologies, Inc. ("Taronis" or the "Company") (f/k/a MagneGas Applied Technology Solutions, Inc.), and other publicly available information. Plaintiff believes that substantial evidentiary support will exist for these allegations after a reasonable opportunity for further investigation or discovery.

## I. NATURE OF THE ACTION

1. This action seeks relief in connection with a fraudulent scheme to artificially inflate the market price of Taronis common stock by deceiving the investing public about the existence of a material contract between Taronis and the City of San Diego that caused Lead Plaintiff and members of the Proposed Class to purchase Taronis common stock at artificially inflated prices.

2. On January 28, 2019, Taronis issued a press release announcing a contract with the City of San Diego whereby San Diego elected to use MagneGas as its metal cutting fuel of choice.

3. If true, such a contract with the City of San Diego would have been a significant and material development for the Company. Indeed, Taronis Chief Executive Officer, President, and Director Scott Mahoney stated as much in the January 28 press release.

4. As expected, the market price for Taronis common stock jumped on the news of the purported contract.

5. Unfortunately for investors, the Company's disclosure about the contract with the City of San Diego was entirely false. Taronis had not entered into any contract

with the City of San Diego for its proprietary metal-cutting fuel; nor was the City adopting the Taronis product as its metal-cutting fuel of choice.

6. Indeed, as evidenced by emails exchanged between officials within the Communications, Internal Operations and Fleet Operations Departments at the City of San Diego immediately after the January 28 press release was issued, there was no contract with Taronis.

7. In fact, the City of San Diego had not provided any indication that it would adopt the Company's proprietary metal-cutting fuel product.

8. In the days that followed, the truth that there was no contract with the City of San Diego began to leak into the investing marketplace. By the end of the class period, just eleven business days after Taronis issued the January 28 press release, and ten business days after the City of San Diego demanded that it be taken down, the Company issued a retraction stating that there was no contract.

9. This federal securities class action on behalf of all persons or entities who purchased or otherwise acquired Taronis common stock between January 28, 2019 and February 12, 2019, both days inclusive (the "Class Period"), seeks to recover damages caused by defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## II. JURISDICTION & VENUE

10. The federal law claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the SEC.

11. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12. This Court has jurisdiction over each defendant named herein because each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and

substantial justice. Moreover, each defendant stipulated to and requested transfer to the District. ECF No. 19.

13. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act because Taronis' U.S. offices are located within this District.

14. In connection with the acts, conduct, and other wrongs alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including, but not limited to, the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

## III. PARTIES

15. Plaintiff purchased Taronis securities during the Class Period at artificially inflated prices as set forth in his previously-filed Private Securities Litigation Reform Act certification. *See* ECF No. 15-2.

16. Defendant Taronis is a Delaware corporation, formerly headquartered in Clearwater, Florida, now with its principal executive offices located at 300 W. Clarendon Avenue, Suite 230, Phoenix, AZ 85013. Taronis common stock traded under the ticker symbol "TRNX" on the NASDAQ stock exchange ("Nasdaq").

17. Defendant Robert Dingess, at all relevant times, served as Chairman of the Board of Directors of the Company and as a member of the Board's Audit Committee.

18. Defendant Scott Mahoney, at all relevant times, served as Chief Executive Officer, President, and a member of the Board of Directors of the Company.

19. Defendant Ermanno P. Santilli, at all relevant times, served as Chief Technology Officer and a member of the Board of Directors of the Company.

20. Defendant Kevin Pollack, at all relevant times, served as a member of the Board of Directors of the Company and as a member of the Board's Audit Committee.

21. Defendant William W. Staunton, at all relevant times, served as a member of the Board of Directors of the Company and as a member of the Board's Audit Committee.

22. Defendants Dingess, Mahoney, Santilli, Pollack, and Staunton are together referred to herein as the "Individual Defendants."

23. Each Individual Defendant: (a) directly participated in the management of the Company; (b) was directly involved in the day-to-day operations of the Company at the highest levels; (c) was privy to confidential proprietary information concerning the Company and its business and operations; (d) was directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) was aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning the Company during and after the Class Period; and/or (g) approved or ratified these statements in violation of the federal securities laws.

24. Together, Taronis and the Individual Defendants are referred to herein as "Defendants."

## IV. SUBSTANTIVE ALLEGATIONS

### A. Background

25. Taronis is an energy company that purportedly offers technology solutions to create, process, and produce hydrogen-based fuel through the gasification of carbon-rich liquids. Taronis formerly operated under the name of MagneGas Applied Technology Solutions, Inc.

26. Taronis has had difficulty maintaining its listing on NASDAQ. Taronis faced delisting due to its stock price (as measured by the bid price) falling below the exchange's minimum bid price of $1.00 for thirty (30) consecutive days per Nasdaq Marketplace Rule 5550(a)(2).

27. On May 7, 2018, Taronis received a notice from Nasdaq indicating that its common stock price had fallen below the $1.00 minimum bid price and, as a consequence, Taronis was given an initial period of one hundred eighty (180) days (until November 5, 2018) in which to regain compliance.

28. In order to regain compliance, Taronis needed to maintain its common stock price above $1.00 for ten (10) consecutive business days, as well as meet the other listing standards required by Nasdaq Capital Market.

29. On November 6, 2018, Taronis was informed by Nasdaq Listing Qualifications Staff that the request for a second 180-day period during which to regain compliance (until May 6, 2019) was granted.

30. On November 13, 2018, Taronis filed a Schedule 14C Definitive Information Statement ("Information Statement") with the SEC which disclosed, among other things, that the Company determined in the latter part of October 2018 that it would not be in compliance with Nasdaq's minimum bid price rule by November 5, 2018 and, as a result, the Company's Board of Directors (the "Board") (composed by the Individual Defendants) determined that it was in the best interests of Taronis that the Board to seek the consent of the Company's majority stockholder to approve a reverse stock split of the outstanding common stock and treasury stock.

31. The Board believed that without such authority and the common stock otherwise meeting the $1.00 minimum closing price, the Company's common stock would be delisted on May 11.

32. Thus, the Board determined it advisable and in the best interests of Taronis and its stockholders that the Board be granted discretionary authority to effect a reverse stock split of the outstanding shares of the Company's common stock at any time on or prior to the date of May 11, 2019, and at an exchange rate of up to one hundred-for-one.

33. The Information Statement disclosed that the reverse stock split was approved by the Board and the Company's majority stockholder on October 31, 2018. Assuming the Board exercised its discretion, "the reverse stock split w[ould] become effective as of the date and time … that the certificate of amendment to the Charter to effect the foregoing is filed with the Secretary of State … in accordance with the Delaware General Corporations Law … without any further action on the part of stockholders …."

34. The principal effect of the reverse stock split would be that "the market price of the common stock immediately after the reverse stock split will increase substantially above the market price of the common stock immediately prior to the reverse stock split."

35. From November 6, 2018 until January 1, 2019, the Company's stock price fluctuated between $.20 and $0.43 with an average price of $0.28.

36. Similarly, from January 1, 2019 until January 27, 2019, the Company's stock price fluctuated between $0.18 and $0.25 with average price of $0.21. The daily volume during this time-period fluctuated between 2.9 million shares and 69.4 million shares (adjusting for the subsequent 1:20 reverse stock split, between 0.147 million shares and 3.47 million shares) with an average daily trading volume of 11.98 million shares (as adjusted, 0.599 million shares).

37. On January 29, 2019, pursuant to a resolution from the Board of Directors, Taronis amended its certificate of incorporation to effectuate a reverse stock split, with every 20 shares of outstanding common stock becoming 1 share of common stock at the close of business on January 30, 2019, in order to raise its stock price above the necessary threshold to maintain its listing on NASDAQ.

### B. Defendants' Scheme to Defraud and False and Misleading Statements in Furtherance Thereof

38. At the same time that Taronis was attempting to boost its stock price through traditional corporate finance methods (*i.e.*, the reverse stock split), the Individual Defendants devised a fraudulent scheme to artificially inflate the market price of the Company's common stock by announcing the signing of a significant and important supply contract with the City of San Diego.

39. Specifically, on January 28, 2019, Taronis disclosed in a Form 8-K filing with the SEC and signed by Defendant Mahoney that the City of San Diego elected to use the Company's MagneGas2 as its fuel of choice, "marking the first major city contract for the adoption of our metal cutting fuels."

40. The Individual Defendants and other members of Taronis senior management reviewed and approved the Company's disclosures in the Form 8-K and the attached press release prior to their filing with the SEC and public dissemination.

41. The Form 8-K filing attached the January 28 press release announcing the contract with the City of San Diego as Exhibit 99.1. The press release issued at 12:00 Eastern Time touted a "Major New Client Win in Southern California" and stated as follows:

> **City of San Diego Adopts MagneGas Metal Cutting Fuel**
>
> *Major New Client Win Southern California*
>
> TAMPA, Fla., Jan. 28, 2019 -- **MagneGas Applied Technology Solutions, Inc. ("MagneGas" or the "Company") (NASDAQ: MNGA)**, a leading clean technology company in the renewable resources and environmental solutions industries, ***announced today that the City of San Diego has elected to use MagneGas as its metal cutting fuel of choice, marking the first major city contract for the adoption of our metal cutting fuels***. The City of San Diego has historically used acetylene to maintain a wide range of equipment used for waste removal, maintenance and infrastructure support and ***as of this contract, the City will immediately begin adoption of MagneGas' cleaner and safer fuel products***. In addition, the San Diego Continuing Education Cultural Complex ("ECC") has elected to begin using MagneGas for the training and recertification of welders in the southern California market.
>
> "We are grateful for the opportunity to serve the City of San Diego and the San Diego Continuing Education Cultural Complex," commented Scott Mahoney, Chief Executive Officer of MagneGas. "We have been steadily marketing our propriety metal cutting fuel for one year since acquiring Complete Welding of San Diego in January of last year."
>
> "We have been presenting our unique capabilities through periodic live demonstrations of our technology, and we have been patiently supporting the local market as we gained the trust and confidence of some of the largest consumers of metal cutting fuels

> in the southern California market. ***The City of San Diego's decision to adopt our product is a major milestone in our growth efforts in California***."
>
> Mr. Mahoney concluded, "We are also very proud of our new relationship with the San Diego Continuing Education Cultural Complex. This is one of the premier training and recertification centers for welders in southern California, and we're proud to help shape this aspect of the curriculum going forward. This relationship will quickly serve as a powerful platform for promoting our products and building new client relationships across the southern part of the state. Being deeply involved in the educational aspect of this industry is strategically important because we have the responsibility to train the next generation of welders on the newest and safest technologies and have them carry it forward in their careers."

(Emphasis added.)

42. Immediately following the announcement, the Company's stock spiked in both value and volume, as set forth below. Indeed, trading volume increased by a multiple of 7 as compared to the trading volume immediately prior to the announcement, and increased 100-fold as compared to the trading volume of the prior trading day.



43. The Company's stock rapidly increased over 25% in the two days following the announcement, with trading volumes of 35.3 million shares (1.76 million shares when adjusted for the subsequent 1:20 reverse stock split) and 17.7 million shares (0.88 million shares when adjusted).

44. On January 28, 2019, Taronis stock closed at $4.74 per share (when adjusted for the subsequent 1:20 reverse stock split).

45. On January 29, 2019, Taronis stock closed at $4.80 per share (when adjusted for the subsequent 1:20 reverse stock split).

46. On January 30, 2019, Taronis stock closed at $4.94 per share (when adjusted for the subsequent 1:20 reverse stock split) and reached an intraday high of $5.12 per share (when adjusted for the subsequent 1:20 reverse stock split).

47. At the close of business on January 30, 2019, the Company implemented its 1 for 20 reverse stock split, issuing 1 new share for every 20 shares each investor held.

48. The January 28 press release announcing the contract with the City of San Diego was subsequently published in multiple news sources and regional newspapers:



49. Similarly, a financial analyst covering the Company for *Zacks Small-Cap Research* circulated the story highlighting the false statement that "MagneGas is adopted as the City of San Diego's metal cutting fuel of choice."




50. On January 31, 2019, Defendant Mahoney led a conference call and webcast starting at 11:00 a.m. with investors that provided an update on business strategy. During the conference call multiple investors referred to the recent announcement of the contract with the City of San Diego. See https://webcasts.eqs.com/magnegas20190131 (last visited August 28, 2019).

51. One investor inquired as to whether the Company would need to increase its production capabilities in Southern California to account for additional fuel requirements associated with the announced contract. *Id*. at 00:36:00.

52. Another investor congratulated the Company on gaining a municipality as a client, opening the door for future growth servicing government clients. *Id*. at 01:11:45. As stated on the webcast:

> Fred Walker, Private Investor
>
> ***I just want to say another thing your investors need to hear is now that you've got into municipalities, the door has been***

> ***opened*** and I sell a lot of our company's products to municipalities all over the United States, ***and once you got your foot in the door with one, others listen and will take heed to the success that San Diego is gonna have with your product***. So we have – ***you just have a tremendous potential with growth*** and I look forward to it and you have a great product and a great team and anything I can do to help, I will be glad to help.
>
> Scott Mahoney
>
> Thank you.
>
> Moderator
>
> Our next question is from Yakov Elizarov from ECG. Please go ahead.
>
> Yakov Elizarov
>
> Yes, Mr. Mahoney, thank you.
>
> I was wondering if you guys are looking into emerging markets such as Georgia or the Balkans where there's also LNG facilities that are being built that are significant to European energy security and significant ports located in those two hubs. As also if domestically you are working with for the metal cutting, if you are working with unions at all like the metalworkers?
>
> Scott Mahoney
>
> Ok. ***So let me answer the second question first because it actually ties in to what Fred's question was just a minute ago. So when you look at the disclosures that were shared the other day on Monday [(January 28, 2019)], I think a lot of people overlooked the school that was highlighted***. That's extremely important because that ties into sort of the same concept as working with the unions. …

(Emphasis added).

53. On January 31, 2019, the Company changed its named from MagneGas Applied Technology Solutions, Inc. to Taronis.

54. Also on January 31, Taronis stock reached its Class Period high of $5.89 per share during intra-day trading.




55. On February 6, 2019, the Company announced a secondary stock offering registering over 3 million shares.

56. The statements referenced in ¶ 41 above were materially false and/or misleading because: (i) Taronis did not have a contract with the City of San Diego; and (ii) the City of San Diego had not elected to use MagneGas as its primary metal cutting fuel of choice.

57. Moreover, the Individual Defendants knew that the statements in the January 28 press release were materially false and/or misleading yet nevertheless approved it for public distribution.

58. Defendants' actions in approving the distribution of the January 28 press release had the principal purpose and effect of creating a false appearance of fact, and, as intended, caused the market price for shares of Taronis common stock to spike upwards upon the announcement.

59. Notably, officials with the City of San Diego were shocked by the falsity of the January 28 press release.[1]

60. As set forth in emails from the City of San Diego's Communications Department Director to the Senior Public Information Officer: "The [Taronis] news release … is incorrect. ***The City of San Diego does NOT have a contract with this company***. … ***This is appalling that they'd get this so wrong***." Ex. A at 1 (emphasis added).

61. The Deputy Director of Fleet Operations similarly communicated: "We have not yet committed and ***by no means is there any contract with MagneGas***." *Id.* at 2 (emphasis added).

62. Moreover, as to the Company's product, it was noted:

> We have demo'd the product as a replacement for the oxygen and acetylene setup we currently use for our metal cutting torches. Preliminary evaluation shows a cost savings on the gas and improved performance. It would require a different regulator than the oxy/actyl combo and ***we are in the process of getting a total count and cost for the replacements***.

*Id.* (emphasis added).

63. Thus, contrary to the representations in the January 28 press release that the City of San Diego had purportedly "elected to use MagneGas as its metal cutting fuel of choice," the City of San Diego ***had not*** committed to the product; it had merely participated in a demonstration**.** There was no adoption of the product by the City of

---

[1] Attached hereto as Exhibit A is a collection of internal emails from the City of San Diego dated January 29, 2019.

San Diego, and by no means had the City of San Diego indicated that it would use MagneGas as its "metal cutting fuel of choice."

64. Indeed, upon information and belief, Taronis had not even begun any official process of becoming an approved vendor for any products for the City of San Diego at this time.

65. Furthermore, upon information and belief, certain Individual Defendants had been advised that the press release should not be issued, especially without approval from The City of San Diego.

**C. The Truth Gradually Emerges**

66. On January 29, 2019, after privately confirming that the statements in the January 28 press release were false, the City of San Diego's Senior Public Information Officer contacted Edison Advisors, the entity which handled investor relations for Taronis, to demand the immediate removal of the press release, and memorialized the communication in an email.[2]

67. The January 29 email provides, In relevant part, as follows:

> Thank you for speaking with me and agreeing to immediately remove the erroneous news release locate[d] here: https://globenewswire.com/news-release/2019/01/28/1706316/0/en/City-of-San-Diego-Adopts-MagneGas-Metal-Cutting-Fuel.html?print=1. As discussed, while the product has been tested, ***the City of San Diego does not have any procurement contract or any agreement with MagneGas Applied Technology Solutions, Inc. to purchase any of its products***. If we receive any media inquiries regarding, I will ask that a retraction be issued as well.

Ex. B at 2 (emphasis added).

68. Upon information and belief, the January 28 press release was immediately removed from the Taronis website following the City of San Diego's demand and is unavailable through that resource.

---

[2] Attached hereto as Exhibit B is a collection of emails between the City of San Diego and Defendants (and their agents) concerning the January 28 press release.

69. Defendants did not, however, remove or retract the press release from any other resource, or timely file any corrective disclosure with the SEC.

70. In its response to the City of San Diego's Senior Public Information Officer, Edison Advisors apologized for any confusion caused by the January 28 press release and advised San Diego officials that Taronis had begun the process of retraction. *Id*. at 1-2. Defendant Mahoney was carbon copied on the email.

71. On January 31, 2019, the Senior Public Information Officer emailed Edison Advisors, and carbon copied Defendant Mahoney, to advise that the January 28 press release was still available on the *Globe Newswire* website and to inquire as to how long before it would be taken down. *Id*. at 1. Defendant Mahoney himself responded, stating: "***It was taken off*** th[e] site ***the day you requested***. I will follow up to ensure that has happened as requested." *Id*. (emphasis added). The January 28 press release, however, was not removed from the *Globe Newswire* website, but rather only removed from the Company's website.

72. In fact, the press release is currently available on the *Globe Newswire* website: http://www.globenewswire.com/news-release/2019/01/28/1706316/0/en/City-of-San-Diego-Adopts-MagneGas-Metal-Cutting-Fuel.html (last visited Aug. 27, 2019).

73. Some investors noticed the removal of the January 28 press release from the Company website and began to comment on social media of its disappearance. For example, on January 30, 2019 on the Twitter social media platform, @HanzMalzer wrote to the Company:



74. Similarly on February 11, 2019, @ileberrynix wrote in response to a tweet from the Company:




75. As the market grew uncertain about the actual existence of a contract with the City of San Diego, the Company's stock price slid. On February 1, 2019, the closing price for Taronis stock dropped to $2.99. By February 11, 2019, the stock closed at $0.97.



76. Finally, on February 12, 2019, eleven business day after Taronis issued the January 28 press release, and ten business days after the City of San Diego demanded that it be taken down, the Company filed a Form 8-K/A with the SEC signed by Defendant Mahoney that finally revealed fully what had slowly leaked out over the prior two weeks as follows:

> On January 28, 2019, Taronis Technologies, Inc., formerly known as MagneGas Applied Technology Solutions, Inc. (the "Company") issued a press release and filed a corresponding Current Report on Form 8–K with the SEC, which stated that the City of San Diego had elected to use MagneGas2 as its metal cutting fuel of choice and that this was the first major city contract for the adoption of the Company's metal cutting fuels. The Company has determined that it is necessary to correct its prior disclosure. The Company has an approval and a written authorization from the City of San Diego's Fleet Operations to move forward with the procurement of gas and other hard goods from the Company at three different locations within the City. This procurement covers more than one division within the municipality, and was received from a city official with sufficient authority to approve the procurement process. In the welding supply and gas distribution business purchases and sales of hard goods and gases are typically made through a process whereby a purchaser receives a quote for goods from the seller and then places an order which is later memorialized in a purchase order. The Company treats purchase orders as contracts and made its prior disclosure with that treatment in view, however, ***the Company does not have any formal binding contracts, agreements or long–term purchase commitments with the City of San Diego beyond the existing approval, nor any commitment that any of the Company's products will be purchased as the products of choice for their respective applications***.

(Emphasis added.)

77. The Individual Defendants and other members of Taronis senior management reviewed and approved the Company's disclosures in the Form 8-K/A prior to its filing with the SEC.

78. As set forth more fully below, even this disclosure was false and misleading: Taronis did ***not*** have "an approval and a written authorization from the City of San Diego's Fleet Operations to move forward with the procurement of gas and other hard goods from the Company at three different locations within the City" at that time.

79. Following the announcement, at the close of the market on February 12, 2019, the stock price was $0.92 per share, with a daily trading volume of 2.08 million shares.

80. Defendants did not disclose falsity of the January 28 press release prior to February 12, 2019 because doing so would run contrary to the purpose of their scheme to artificially inflate the price Taronis common stock, obtain compliance with Nasdaq's minimum bid price of $1.00 during a consecutive ten (10) business day period, and cause the investing public to purchase Taronis common stock at artificially inflated prices.

81. As a result of Defendants' wrongful conduct, and the precipitous decline in the market value of the Company's securities, Plaintiff and the other members of the Class suffered significant damages.

**D. Post-Class Period Events**

82. On April 8, 2019, Taronis filed its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 ("2018 Annual Report") with the SEC. The 2018 Annual Return is signed by Defendant Mahoney and the Chief Financial Officer of the Company. It sets forth in Item 1A Risk Factors, under the section for non-compliance with Nasdaq listing requirements: "Although the Company effected the Reverse Stock Split as of January 30, 2019 at 5p.m. Eastern Time, the price of our Common Stock subsequently fell below $1.00 ***due to uncontrollable market conditions*** prior to having

traded above $1.00 for the minimum ten consecutive business days required to regain compliance." (Emphasis added.)

83. The stock price for Taronis did not fall due to uncontrollable market conditions following the reverse stock split. The stock price fell due to the fact that there was no contract between the Taronis and the City of San Diego, and the investing public subsequently discovered that they had been misled by the Company about the existence of a material contract with the City of San Diego.

84. On August 19, 2019, Taronis conducted a Second Quarter 2019 Earnings conference call. During the call, Defendant Mahoney stated, in relevant part, as follows:

> So we had a purchase order from three different departments from the city of San Diego. We asked consent from the guy that we had the written purchase contracts from to use their name and go ahead and let them know or let everybody know that we had won a new customer.
>
> And when that went out, someone upstairs got a call from the incumbent provider, who is all bent out of shape, it's one of the big guys, and said hey, are you guys switching everything you do? Meaning, buying things other than our MagneGas. So, buying wire, or welding equipment, or protective gear. I mean this was a contract for like hundreds of thousands of dollars. So guy said no, we are just buying some MagneGas.
>
> We like the product. I mean, like well, if you guys don't make him take that press release down we're going to stop doing business with you, and we're going to say that you breached your other purchase agreements. So if I'm selling him MagneGas, it has nothing to do with him buying some welding equipment, right? The other guy tied it and said -- the other guy said, you have to basically make them take the press release down.
>
> So as a courtesy to a customer, we took the press release down. That's it.

(Attached as Exhibit D is an abridged version of the conference call transcript).

85. But the internal emails from the City of San Diego directly contradict these statements. The emails confirm that there were no written purchase contracts on January 28, 2019, and no written purchase orders from three different departments of the City of San Diego.

86. Moreover, the emails between the City of San Diego and Taronis establish that the January 28 press release was not taken down as a courtesy to a customer; it was taken down because the representations therein were unambiguously false. *See, e.g.*, Ex. B at 2 ("Thank you for … agreeing to immediately remove the erroneous news release …. As discussed, while the product has been tested, the City of San Diego does not have any procurement contract or any agreement with [Taronis] to purchase any of its products.").

## V. ADDITIONAL ALLEGATIONS OF SCIENTER

87. As alleged herein, Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

88. Indeed, even when the City of San Diego, the purported counter-party to the contract, explicitly confirmed to the Defendants that the January 28 press release was false within twenty-four (24) hours of its publication and requested that it be taken down, Defendants did not issue a corrective disclosure to Taronis shareholders or the investing public until the time period necessary to comply with Nasdaq's minimum bid price had expired.

89. Even when the contract with the City of San Diego and its importance was specifically raised during the January 31, 2019 investor conference call, Defendant Mahoney did not disclose that there was no contract with the City of San Diego and that

the statements in the January 28 press release were manifestly false. Rather, he simply responded with a "thank you." *See, supra*, ¶ 51-52.

90. Notably, at 10:22 a.m. on January 31, 2019 (*see* Exhibit B at 1), just prior to the investor conference call, Defendant Mahoney assured the Senior Public Information Officer with the City of San Diego that Taronis had taken down the January 28 press release.

91. While Defendants' communications with the City of San Diego regarding the falsity of the January 28 press release and agreement to remove it demonstrate strong evidence of conscious misbehavior or recklessness, motive and opportunity are also evident because Defendants were working to maintain the Company's listing on Nasdaq and, in connection with those requirements, sought to delay issuing a corrective disclosure until after expiration of the ten (10) consecutive business day period necessary to comply with Nasdaq's $1.00 minimum bid price.

92. Defendants' public filings with the SEC that attempt to conceal or otherwise obfuscate the true nature of their wrongdoings are also highly probative of scienter. For example, the February 12, 2019 Form 8-K/A filing with the SEC states: "The Company has an approval and a written authorization from the City of San Diego's Fleet Operations to move forward with the procurement of gas and other hard goods from the Company at three different locations within the City."

93. In truth, however, there was no approval to move forward as of the time the Form 8-K/A was filed. On February 7, 2019, a City of San Diego Fleet Operations Fleet Manager expressly set forth in an email[3] to Taronis: "The last thing I would like from you ***before we move forward*** is a guarantee of availability of the Magne[G]as product, a proof of environmental impact, and the cost savings that we will see versus the acetylene product. This will be an important part in justifying the switch in addition

[3] Attached hereto as Exhibit C is a collection of emails between the City of San Diego Fleet Operations and Taronis.

to the time saving part the product provides." Exhibit C at 1 (emphasis added). The requested information was not provided to the City of San Diego until February 14, 2019, two days ***after*** the filing of the Form 8-K/A. *See* Exhibit C at 1.

94. Defendants' post-Class Period statements that similarly attempt to conceal or otherwise obfuscate their wrongdoings and provide additional evidence of scienter. For example, in the 2018 Annual Report, Defendants falsely assert that "uncontrollable market conditions" were the cause for the decline of the price for Taronis common stock, rather than the unexplained removal of the January 28 press release from the Taronis website on January 29 and the leaking disclosures, which were ultimately confirmed by the Company on February 12, 2019, that there was never any contract with the City of San Diego.

95. As part of the Audit Committee, Defendants Dingess, Pollack, and Staunton all undertook a duty to oversee the Company and ensure compliance by the Company and its employees with internal policies. One such policy was the Company's Code of Business Conduct and Ethics which required that "[t]he CEO and legal counsel must review and approve all contracts with any government entity."

96. As alleged herein, Defendant Mahoney knowingly issued misleading statements to public stockholders concerning the contract with the City of San Diego. As one of the individuals at Taronis charged with the duty to review and approve all contracts with any government entity, Defendant Mahoney knew that there was no contract with the City of San Diego prior to the public dissemination of the January 28 press release and its filing with the SEC. Defendant Mahoney nonetheless authorized and approved the false disclosure.

97. Furthermore, the Audit Committee's failure to ensure compliance with its promulgated policies was at the minimum reckless. Moreover, as the City of San Diego contacted the Company and requested removal of the false press release, the failure to issue a corrective statement by the members of the Board and/or the Audit Committee provides an inference of scienter.

98. The statements made by Defendant Mahoney during the Company's Second Quarter 2019 Earnings call in the effort to conceal or hide wrongdoing, likewise, offers strong evidence of scienter.

99. A timeline summary of Plaintiff's allegations as detailed above is attached hereto as Exhibit E.

**VI. NO SAFE HARBOR**

100. The statutory safe harbor provided for certain forward-looking statements do not apply to any of the false statements alleged herein. None of the statements alleged herein is a "forward-looking statement" and no such statement was identified as a "forward-looking statement" when made. Rather, the statements alleged herein to be false and misleading all relate to facts and conditions existing at the time the statements were made. Moreover, cautionary statements, if any, did not identify important factors that could cause actual results to differ materially from those in any forward-looking statements.

101. In the alternative, to the extent that the statutory safe harbor does apply to any statement pleaded herein that is deemed to be forward-looking, the Defendants are liable for such false forward-looking statements because, at the time each such statement was made: (i) the speaker actually knew and/or recklessly disregarded the fact that such forward-looking statement was materially false or misleading and/or omitted facts necessary to make statements previously made not materially false and misleading; and/or (ii) each such statement was authorized and/or approved by a director and/or executive officer of the Company who actually knew or recklessly disregarded the fact that each such statement was false and/or misleading when made.

102. None of the historic or present tense statements made by the Defendants was an assumption underlying or relating to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor

were any of the projections or forecasts made by the Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## VII. LOSS CAUSATION AND ECONOMIC LOSS

103. During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's stock price, and operated as a fraud or deceit on acquirers of the Company's common stock. As detailed above, when the truth about Taronis' misconduct and its lack of an actual contract with the City of San Diego was slowly revealed, the value of the Company's common stock declined precipitously as the prior artificial inflation no longer propped up its stock price. The decline in Taronis' common stock price was a direct result of the nature and extent of Defendants' fraud fully and finally being revealed to investors and the market. The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Lead Plaintiff and other members of the Class was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.

104. The economic loss, i.e., damages, suffered by Lead Plaintiffs and other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the Company's stock price and the subsequent significant decline in the value of the Company's stock price when Defendants' prior misrepresentations and other fraudulent conduct was revealed.

105. At all relevant times, Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by the Lead Plaintiff and other Class members. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of Taronis' business, operations and financial condition, as alleged herein. Throughout the Class Period, Defendants publicly issued materially false and misleading statements and omitted material facts necessary to make Defendants' statements not

false or misleading, causing Taronis' common stock to be artificially inflated. Lead Plaintiff and other Class members purchased Taronis' common stock at those artificially inflated prices, causing them to suffer the damages complained of herein.

## VIII. CLASS ACTION ALLEGATIONS

106. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased or otherwise acquired Taronis securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

107. The members of the Class are so numerous that joinder of all members is impracticable, since Taronis has millions of shares of stock outstanding and because the Company's shares were actively traded on NASDAQ. As of April 8, 2019, Taronis had more than 24.2 million shares issued and outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are thousands of members in the proposed Class and that they are geographically dispersed.

108. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual Class members, include, *inter alia*:

(a) whether Defendants violated the Exchange Act as alleged;

(b) whether Defendants, by their involvement and participation in a scheme to artificially inflate the market price of Taronis common stock, employed a scheme or artifice to defraud, or engaged in acts, practices, or a course of conduct which operated as a fraud or deceit in connection with the purchase of Taronis common stock by Class members;

(c) whether Defendants omitted and/or misrepresented material facts in their publicly-disseminated SEC filings, press releases, and statements during the Class Period;

(c) whether the price of Taronis securities was artificially inflated during the Class Period as a result of the scheme to defraud, material omissions and/or misrepresentations complained of herein; and

(d) whether the members of the Class have sustained damages as a result of the decline in value of Taronis' stock when the truth was revealed.

109. Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct in a substantially identical manner.

110. Plaintiff will adequately protect the interests of the Class and has retained counsel experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the other members of the Class.

111. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## IX. CLAIMS FOR RELIEF

### <u>COUNT I</u>

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder Against Defendants Taronis and Mahoney

112. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

113. This Count is asserted against Defendants Taronis and Mahoney pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(b) promulgated thereunder by the SEC.

114. By their acts, transactions, and courses of conduct as specified above, Defendants Taronis and Mahoney knowingly and/or recklessly deceived Plaintiff and the Class about a material contract between Taronis and the City of San Diego with the

intention of artificially inflating the market price of Taronis common stock. This plan, scheme, and course of conduct was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff; (b) artificially inflate the market prices of Taronis common stock; and (c) cause Plaintiff and the members of the Class to purchase Company common stock at artificially inflated prices.

115. In furtherance of the plan, scheme, and course of conduct, Defendants Taronis and Mahoney took the actions alleged above. While in possession of material, adverse, non-public information, Defendants Taronis and Mahoney made and disseminated untrue statements of material fact concerning the purported contract between Taronis and the City of San Diego, and/or omitted to state material facts to make such statements not misleading in the effort to create and maintain artificially high market prices for Taronis common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5(b).

116. Defendant Mahoney, as Chief Executive Officer, President, and a Director of Taronis, is a member of senior management of Taronis and directly responsible for the false and misleading statements and/or omissions disseminated to the investing public, including Plaintiff and members of the Class, through press releases and filings with the SEC.

117. The misrepresentations and/or omissions by Defendants Taronis and Mahoney were intentional or deliberately reckless insofar as they: knew that the public documents and statements issued or disseminated in the name of Company a were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants Taronis and Mahoney, by virtue of their receipt of information reflecting the true facts regarding Taronis, their control over and/or receipt of and/or modification of Taronis' allegedly materially false and misleading statements, and/or their associations with the Company,

which made them privy to confidential proprietary information concerning Taronis, participated in the fraudulent activity alleged above. Defendants Taronis and Mahoney acted with scienter under Section 10(b) of the Exchange Act and Rule 10b-5(b).

118. The fraudulent acts of Defendants Taronis and Mahoney occurred in connection with the purchase or sale of Taronis common stock.

119. But for Defendants' fraud, members of the Class would not have purchased Taronis common stock at artificially inflated prices, or at all.

120. As a result of the fraudulent acts of Defendants Taronis and Mahoney, the market prices of Taronis securities were artificially inflated during the Class Period. In ignorance of the fraudulent conduct of Defendants Taronis and Mahoney, and relying directly or indirectly on the integrity of the market price for Taronis common stock, Plaintiff and other members of the Class purchased Taronis common stock at artificially inflated prices during the Class Period.

121. As a direct and proximate cause of the wrongful conduct by Defendants Taronis and Mahoney as alleged herein, Plaintiff and other members of the Class have suffered damages in connection with their purchases of Taronis common stock in an amount to be established at trial.

122. By reason of the foregoing, Defendants Taronis and Mahoney are liable to Plaintiff and other members of the Class for the substantial damages they suffered in connection with their purchases of Taronis common stock during the Class Period.

## COUNT II

### Violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c) Promulgated Thereunder Against All Defendants

123. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

124. This Count, asserted against all Defendants, is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC.

125. By their acts, transactions, and courses of conduct as specified above, Defendants knowingly and/or recklessly deceived Plaintiff and the Class about a material contract between Taronis and the City of San Diego for the purpose of artificially inflating the market price of Taronis common stock. This plan, scheme, and course of conduct was intended to and, throughout the Class Period, did: (a) deceive the investing public, including Plaintiff; (b) artificially inflate and maintain the market for and market prices of Taronis common stock; and (c) cause Plaintiff and the members of the Class to purchase Company common stock at artificially inflated prices. The Individual Defendants, who are senior officers and/or directors of Taronis, had actual knowledge of the plan, scheme, and course of conduct.

126. In furtherance of the unlawful plan, scheme, and course of conduct, Defendants, took the actions alleged above in contravention of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c). Defendants employed a deceptive scheme or device to deceive Plaintiff and members of the Class as to the success and viability of the Company's business by: (i) engaging in a scheme to misrepresent the existence of a material contract between Taronis and the City of San Diego; (ii) participating, directly and indirectly, in the preparation and issuance of the materially false and misleading January 28 press release; and (iii) participating, directly and indirectly, in the decision not to issue any kind of corrective disclosure until after Taronis failed to comply with Nasdaq's minimum bid price upon completion of the ten (10) day business period following the issuance of the January 28 press release.

127. Defendants Pollack, Dingess and Staunton all served on the Audit Committee, which required each of them to monitor and enforce Company policies. But as set forth above, Defendant Mahoney did not adhere to Company policies in connection with government contracts. Consequently, these Defendants who served on the Audit Committee failed to satisfy their obligations to monitor and enforce compliance with Company policies.

128. Defendants engaged in the fraudulent activity described herein knowingly and intentionally or in such an extremely reckless manner as to constitute willful deceit and fraud upon Plaintiff and the other members of the Class who purchased Taronis common stock during the Class Period. Defendants acted with scienter and are liable under Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

129. Defendants' fraudulent acts occurred in connection with the purchase or sale of Taronis common stock.

130. As a result of Defendants' fraudulent acts, the market prices for Taronis common stock were artificially inflated during the Class Period. In ignorance of Defendants' fraudulent conduct, and relying directly or indirectly on the integrity of the market price for Taronis common stock, Plaintiff and other members of the Class purchased Taronis common stock at artificially inflated prices during the Class Period.

131. But for Defendants' fraud, members of the Class would not have purchased Taronis common stock at artificially inflated prices, or at all.

132. As a direct and proximate cause of Defendants' wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in connection with their purchases of Taronis common stock in an amount to be established at trial.

133. By reason of the foregoing, Defendants are liable to Plaintiff and other members of the Class for the substantial damages they suffered in connection with their purchases of Taronis common stock during the Class Period.

## COUNT III

### Violation of Section 20(a) of the Exchange Act

### Against The Individual Defendants

134. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

135. As alleged herein, Defendant Taronis violated Section 10(b) of the Exchange Act and Rule 10b-5 by participating in a fraudulent scheme and course of conduct in connection with the purchase or sale of Taronis common stock, and by

making false and misleading statements and omissions in connection with the purchase or sale of Taronis common stock.

136. By virtue of their positions with Taronis, the Individual Defendants participated in the operation and management of the Company and conducted and participated, directly or indirectly, in the conduct of its business affairs. The Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Taronis, including the content and dissemination of the January 28 press release to the marketplace during the Class Period, which Plaintiff contends is false and misleading, and the Company's plan, scheme, and course of conduct. The Individual Defendants were provided with, or had access to, copies of the Company's reports, press releases, and public filings. Moreover, the Individual Defendants were provided with, or had access to, copies of the January 28 press release and the Company's emails with the City of San Diego and had the ability to prevent the issuance of the false and misleading statements and omissions, or cause the false and misleading statements and omissions to be corrected.

137. As officers and/or directors of a publicly-owned company, the Individual Defendants had a duty to disseminate accurate and truthful information about Taronis to the investing public, and to correct promptly any public statements issued by Taronis that had become materially false or misleading. In addition, Defendant Mahoney had direct and supervisory involvement in the day-to-day operations of Taronis and, therefore, is presumed to have had the power to control of the particular transactions giving rise to the securities violations alleged herein, and exercised such power. Defendant Mahoney was able to and did control and approve the content of various SEC filings, press releases, and investor presentations concerning the purported contract between Taronis and the City of San Diego, during the Class Period and thereafter. Defendant Mahoney had access to adverse undisclosed information regarding the non-existence of the any contract between Taronis and the City of San Diego. As alleged above, Defendant Mahoney participated in the drafting, preparation, and/or approval of

the various SEC filings, press releases, and investor presentations concerning the purported contract between Taronis and the City of San Diego

138. As a result of their positions of control and authority as senior officers and/or directors of Taronis, the Individual Defendants are "controlling persons" of Taronis within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged herein, which artificially inflated the market price of Taronis securities. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Taronis.

139. As a direct and proximate cause of the Individual Defendants' wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in connection with their purchases of Taronis common stock in an amount to be established at trial.

140. By reason of the foregoing, the Individual Defendants are liable to Plaintiff and other members of the Class for the damages they suffered in connection with their purchases of Taronis common stock during the Class Period.

**X. PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

(A) Declaring this action to be a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure, and designating Plaintiff as class representative and Plaintiff's counsel as Class Counsel;

(B) Awarding compensatory damages in favor of Plaintiff and the other members of the Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(C) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in the prosecution of this action, including reasonable attorneys' fees and expert fees; and

(D) Awarding such other and further relief as the Court may deem just and proper.

## XI. JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: August 30, 2019

Respectfully Submitted,

/s/ Matthew M. Guiney
Matthew M. Guiney (*pro hac vice*)
Malcolm T. Brown (*pro hac vice*)
Kevin G. Cooper (*pro hac vice*)
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114
Guiney@whafh.com
Brown@whafh.com
KCooper@whafh.com

*Lead Counsel for Lead Plaintiff Kui Zhu and the Proposed Class*

JOHNSON FISTEL LLP
Michael, I. Fistel, Jr.
40 Powder Springs Street
Marietta, Georgia 30064
Tel: 470-632-6000
Fax: 770-200-3101
michaelf@johnstonfistel.com

*Additional Counsel for Lead Plaintiff Kui Zhu*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2019, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served electronically through the CM/ECF system to all counsel of record.

/s/ Matthew M. Guiney
Matthew M. Guiney