Matthew M. Guiney (admitted *pro hac vice*)
guiney@whafh.com
Malcolm T. Brown (admitted *pro hac vice*)
brown@whafh.com
Kevin G. Cooper (admitted *pro hac vice*)
kcooper@whafh.com
**WOLF HALDENSTEIN ADLER
  FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600

*Lead Counsel for Lead Plaintiff Kui Zhu
and the Proposed Class*

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| KUI ZHU, on behalf himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TARONIS TECHNOLOGIES, INC., et al.,<br><br>Defendants. | No. CV-19-04529-PHX-GMS<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** |

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

RELEVANT FACTUAL BACKGROUND ....................................................................... 1

LEGAL STANDARD ....................................................................................................... 5

ARGUMENT .................................................................................................................... 6

I.      THE AMENDED COMPLAINT ADEQUATELY ALLEGES FALSE OR
        MISLEADING STATEMENTS ............................................................................ 6

II.     THE AMENDED COMPLAINT RAISES A STRONG INFERENCE OF
        SCIENTER ......................................................................................................... 11

III.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS
        CAUSATION ..................................................................................................... 16

IV.     THE AMENDED COMPLAINT ADEQUATELY ALLEGES A
        SCHEME LIABILITY CLAIM .......................................................................... 18

        A.     Plaintiff Alleges that the Individual Defendants are Liable for
               Disseminating False or Misleading Statements to Investors ..................... 18

        B.     Plaintiff Alleges the Individual Defendants' Misconduct with
               Particularity ............................................................................................... 19

        C.     Plaintiff Alleges a Strong Inference of Scienter ........................................ 20

        D.     Plaintiff's 10b-5(a) and (c) Claim Encompasses Conduct Beyond
               His 10b-5(b) Claim .................................................................................... 22

CONCLUSION ............................................................................................................... 22

i

## TABLE OF AUTHORITIES

**CASES**                                                                      **Page(s)**

*In re Allied Nevada Gold Corp. Securities Litigation*,
   743 F. App'x 887 (9th Cir. 2018)............................................................... 12, 18

*In re Arizona Theranos, Inc., Litigation*,
   308 F. Supp. 3d 1026 (D. Ariz. 2018) ............................................................. 5

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ........................................................................................ 5

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................ 5

*Berson v. Applied Signal Technology, Inc.*,
   527 F.3d 982 (9th Cir. 2008) ................................................................. *passim*

*City of Dearborn Heights Act 345 Police & Fire Retirement System v. Align Tech., Inc.*,
   856 F.3d 605 (9th Cir. 2017) .......................................................................... 8

*In re CytRx Corp. Securities Litigation*,
   No. CV 14-1956-GHX (PJWx),
   2015 U.S. Dist. LEXIS 91447 (C.D. Cal. July 13, 2015) ........................ 19, 20

*Crago v. Charles Schwab & Co.*,
   No. 16-cv-3938-RS,
   2017 U.S. Dist. LEXIS 215871 (N.D. Cal. Dec. 5, 2017) ............................ 14

*Employees' Retirement System v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ......................................................................11-12

*In re Galena Biopharma, Inc. Securities Litigation*,
   117 F. Supp. 3d 1154 (D. Or. 2015) ................................................... 15, 16, 22

*Gebhart v. Securities and Exchange Commission*,
   595 F.3d 1034 (9th Cir. 2010) ....................................................................... 11

*In re Impinj, Inc. Securities Litigation*,
   No. C18-5704RSL,
   2019 U.S. Dist. LEXIS 172802 (W.D. Wash. Oct. 3, 2019)................. 13, 17, 18

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   416 F.3d 940 (9th Cir. 2005) ..................................................................... 7, 17

*Lloyd v. CVB Financial Corp.*,
   811 F.3d 1200 (9th Cir. 2016) ...............................................................................7-8

*Lomingkit v. Apollo Education Group Inc.*,
   275 F. Supp. 3d 1139 (D. Ariz. 2017) ...................................................................... 10

*Lorenzo v. Securities and Exchange Commission*,
   139 S. Ct. 1094 (2019) ............................................................................................. 19

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ..................................................................................................... 7

*Maverick Fund, L.D.C. v. First Solar, Inc.*,
   No. CV15-1156-PHX-DGC,
   2018 U.S. Dist. LEXIS 200402 (D. Ariz. Nov. 27, 2018) .................................. 7, 12, 16

*Mineworkers Pension Scheme v. First Solar Inc.*,
   881 F.3d 750 (9th Cir. 2018) ................................................................................ 16, 17

*New Enterprises v. SenesTech, Inc.*,
   No. CV-18-8033-PCT-JAT,
   2019 U.S. Dist. LEXIS 139012 (D. Ariz. Aug. 16, 2019) ...................................... 11, 17

*New Mexico State Investment Council v. Ernst & Young LLP*,
   641 F.3d 1089 (9th Cir. 2011) .................................................................................... 12

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding Corp.*,
   320 F.3d 920 (9th Cir. 2003) ...................................................................................... 20

*Northstar Financial Advisors, Inc. v. Schwab Investments*,
   779 F.3d 1036 (9th Cir. 2015) .................................................................................... 21

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
   380 F.3d 1226 (9th Cir. 2004) .................................................................................... 13

*In re Quality Systems*,
   865 F.3d 1130 (9th Cir. 2017) .................................................................................... 12

*Rabkin v. Lion Biotechnologies, Inc.*,
   No. 17-cv-2086-SI,
   2018 U.S. Dist. LEXIS 25326 (N.D. Cal. Feb. 15, 2018) ............................................ 22

*Reese v. Malone*,
  747 F.3d 557 (9th Cir. 2014) .................................................................... 8, 13, 21

*Schueneman v. Arena Pharmaceuticals, Inc.*,
  840 F.3d 698 (9th Cir. 2016) ........................................................................... 5, 7

*Sierp v. DeGreen Partners LP*,
  No. CV-16-00189-PHX-GMS,
  2017 U.S. Dist. LEXIS 2223 (D. Ariz. Jan. 6, 2017) ........................................ 17

*South Ferry LP #2 v. Killinger*,
  542 F.3d 776 (9th Cir. 2008) ................................................................ 12, 20, 21

*Starr v. Baca*,
  652 F.3d 1202 (9th Cir. 2011) ............................................................................ 5

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................... 11, 12

*United States v. Laurienti*,
  611 F.3d 530 (9th Cir. 2010) ............................................................................. 7

**STATUTES & RULES**

15 United States Code § 78u-4(b) ........................................................................ 7

Federal Rule of Evidence 201(b) ........................................................................ 21

**OTHER AUTHORITIES**

Black's Law Dictionary, Sixth Edition ................................................................. 9

City of San Diego Purchase Order Guidelines, Complete Agreement, *available at*
https://www.sandiego.gov/purchasing/vendor/purchaseorder ............................ 9

City of San Diego, Purchasing & Contracting: Goods and Services Contracts FY19,
*available at* https://www.sandiego.gov/purchasing/bids-contracts/contracts (last visited
Nov. 26, 2019) ................................................................................................ 10

SEC Form 10-K, 2018 Annual Report (Apr. 12, 2019), *available at*
https://www.sec.gov/Archives/edgar/data/1353487/000149315219005182/form10k.htm#
a_002 .............................................................................................................. 21

iv

Lead Plaintiff Kui Zhu respectfully submits this opposition to the Defendants' motion to dismiss Plaintiff's Amended Class Action Complaint ("Motion" or "Mot.").[1]

### PRELIMINARY STATEMENT

This action arises out of the Defendants' blatant misrepresentation that Taronis had entered into a supply contract with the City of San Diego, which artificially inflated the market price of Taronis common stock. The Class Period begins when Taronis announced a "contract [whereby the City of San Diego would] immediately begin adoption of" Taronis fuel products. The City's decision to use Taronis's proprietary product – MagneGas2 – as its metal cutting fuel of choice purportedly constituted a "major milestone" for the Company and its investors. ¶41. But City of San Diego employees were immediately baffled by the completely baseless announcement, emailing one another in blunt terms: "The City … does NOT have a contract with this company. … This is appalling that they'd get this so wrong." ¶60. The following day, on the heels of the City's internal communications, City employees demanded that the Defendants remove the erroneous and baseless announcement because "The City of San Diego ***does not*** have ***any*** procurement contract or ***any*** agreement with [Taronis] to purchase ***any*** of its products." ¶67 (emphasis added). While the Defendants immediately removed the press release from the Taronis website, they took no other steps to correct the false and misleading disclosures still available to investors on other websites and through Taronis's SEC filings.  As a result, Class members were deceived and purchased Taronis common stock during the Class Period at artificially inflated prices.

The Class Period ends on February 12, 2019, when the Defendants finally announced what was evident to both the Defendants and the City of San Diego weeks earlier: Taronis did "not have any formal binding contracts, agreements or long-term purchase commitments with the City of San Diego." ¶76.

---

[1] Unless otherwise indicated, all capitalized terms herein are defined in the First Amended Class Action Complaint for Violations of the Federal Securities Laws (ECF No. 36) ("Amended Complaint"). "¶__" citations are to the Amended Complaint.

As set forth more fully below, the Amended Complaint amply satisfies the pleading requirements under Section 10(b) of the Exchange Act and SEC Rule 10b-5 (collectively, "10b-5") and the PSLRA. The well-pled facts, which include contemporaneous emails from City of San Diego employees with knowledge concerning the purported contract and approval, sufficiently allege that: (i) the Defendants engaged in a scheme to defraud and consciously made and disseminated false statements; (ii) their conscious or deliberately reckless misconduct gives rise to a strong inference of scienter; and (iii) Plaintiff's loss is causally connected to the alleged misconduct. For these reasons, the Motion should be denied.

## RELEVANT FACTUAL BACKGROUND

Taronis is a NASDAQ listed company that purportedly offers technology solutions to create, process, and produce hydrogen based fuel through the gasification of carbon-rich liquids. ¶¶16, 25. Defendant Mahoney is the President and Chief Executive Officer ("CEO") of Taronis. ¶18. The Individual Defendants compose Taronis's Board. Dingess, Pollack, and Staunton are members of the Board's Audit Committee. ¶¶17-21.

As directors and officers, the Individual Defendants managed Taronis and its day-to-day operations, were privy to confidential, non-public information concerning Taronis and its business, were involved in the oversight of Taronis and the implementation of its internal controls, and participated in the drafting, review, approval, and public dissemination of the SEC filings and press releases at issue in this action. ¶¶23, 30-33, 37, 40, 57, 76-77, 95-96, 116, 127. Taronis's Code of Business Conduct and Ethics (the "Code") (which applies to the directors, officers, and employees of Taronis) mandated that Mahoney (as CEO) "review and approve *all* contracts with *any* government entity." ¶¶95-96 (emphasis added). Audit Committee members Dingess, Pollack, and Staunton were charged with ensuring that Taronis and its employees complied with the Company's internal policies, including the Code. ¶¶95-97, 127.

In 2018, Taronis faced delisting from NASDAQ when its common stock price closed below the exchange's $1 per share minimum bid price for 30 consecutive days as

per NASDAQ Marketplace Rule 5550(a)(2). ¶26. NASDAQ advised Taronis of its noncompliance on May 7, and provided the Company with an initial period of 180 days (until November 5, 2018) to regain compliance if the stock closed above the minimum bid price for 10 consecutive business days. On November 6, NASDAQ granted Taronis's request to extend its time to comply until May 6, 2019. ¶¶27-29.

On November 13, 2018, Taronis filed an Information Statement with the SEC disclosing that the Board, in an effort to avoid delisting, obtained consent from the Company's majority stockholder to effect a reverse stock split at an exchange rate of up to 100 for 1. ¶¶30-33. On January 29, 2019, the Board approved a resolution for a reverse stock split at an exchange rate of 20 for 1. ¶37. The reverse stock split was implemented on January 30, 2019. ¶47.

As the Individual Defendants attempted to boost Taronis's stock price by decreasing the number of outstanding shares, ¶34, they simultaneously devised a scheme to deceive investors about the existence of a major new contract with the City of San Diego and thereby artificially inflate the price of Taronis common stock. ¶¶1, 38.

On January 28, 2019, in a Form 8-K filing signed by Mahoney, Taronis announced the City's election to use MagneGas2 as its metal cutting fuel of choice, "marking the first major city contract for the adoption of [its] fuels." ¶¶2, 39. The Individual Defendants reviewed and approved the Form 8-K and press release ("January 28 disclosures") for filing and public dissemination. ¶40. The press release further disclosed that "as of this contract, the City will immediately begin adoption of [Taronis's] … products," and included a comment by Mahoney that the "City's … decision to adopt our product is a major milestone in our growth efforts in California." ¶41. Each of these statements was false or misleading. ¶¶5, 56-57.

At bottom, the Individual Defendants knew that the disclosures were false or misleading when they approved them for publication because there was **never** any contract or election by the City to use Taronis products. ¶¶56-57, 87. Mahoney knew there was not any contract because he would have had to review and approve it in

- 3 -

advance of the announcement. ¶¶95-96. As core members of management at Taronis and as participants to the scheme, the Individual Defendants likewise also knew that there was no contract. ¶¶1, 23, 38, 40, 56-58, 87-88, 95, 97, 114-17, 125-26.

On January 29, 2019, after learning of the false January 28 disclosures, ¶¶59-63 & Ex. A, City officials *immediately* contacted Taronis and demanded that the press release be retracted. ¶¶66-67. Taronis complied, immediately, without any pushback or opposition.  The City's January 29 confirmatory email to Taronis verifies that the press release was, quite simply, false:

> Thank you for speaking with me and *agreeing to immediately remove the erroneous news release* …. As discussed … the City … does not have *any procurement contract* or *any agreement* with [Taronis] to purchase *any of its products*. If we receive any media inquiries regarding this matter, I will ask that a retraction be issued as well.

¶67 & Ex. B at 2 (emphasis added). Taronis removed the press release from its website without denying or disputing any of the City's assertions of falsity. ¶¶70-71 & Ex. B at 1-2.

Investors, still unaware of the Defendants' misconduct, reacted swiftly to the news about Taronis's first major city contract. ¶4. In the two days after the January 28 disclosures were made, the price for Taronis common stock price increased over 25%. On January 28, 29, and 30, the per share price of the stock closed at $4.74, $4.80, and $4.94, respectively (adjusted for the subsequent 1:20 reverse stock split). ¶¶42-46. While some investors noticed that Taronis removed the press release from its website shortly after posting, ¶73, others investors who relied on SEC filings and other sources did not, and the Individual Defendants did nothing to timely enlighten them. ¶¶50-52, 69, 72, 88. Doing so would have scuttled the scheme to boost the Company's stock price and brought the Individual Defendants' misconduct fully to light. ¶80.

For example, during a January 31, 2019 conference call, and despite specific inquiry and comments by investors about the purportedly new contract with the City, Mahoney failed to inform investors that the contract did not exist, despite the fact that

just *minutes* before the call was initiated, Mahoney confirmed in an email to the City that the press release had been removed as requested. ¶¶50, 71, 89-90.

As a result of the Defendants' misconduct, Plaintiff purchased Taronis common stock during the Class Period at artificially inflated prices. ¶¶15, 114, 119-20, 130-31. Following news leaking into the marketplace and the filing of a corrective disclosure admitting that Taronis did "not have any formal binding contracts, agreements or long-term purchase commitments with the City of San Diego" the price for Taronis common stock plummeted, and Plaintiff and other Class members were harmed. ¶¶8, 73-77, 79-81.

## LEGAL STANDARD

A claim for a primary violation of 10b-5 for misstatements or omissions must allege: "(1) a material misrepresentation or omission … [falsity]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance …; (5) economic loss; and (6) loss causation." *Schueneman v. Arena Pharms., Inc.,* 840 F.3d 698, 704 (9th Cir. 2016) (citation and internal quotation marks omitted).

To survive a motion to dismiss "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and internal quotations omitted). The standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The motion should be denied if the allegations "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007). If there are two alternative explanations for the misconduct alleged, one advanced by the defendant and the other by the plaintiff, both of which are plausible, the complaint survives the motion. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). The "complaint may be dismissed *only* when defendant's plausible alternative explanation is so convincing that plaintiff's explanation is *implausible.*" *In re Ariz. Theranos, Inc., Litig.*, 308 F. Supp. 3d 1026, 1039 (D. Ariz. 2018) (citation and internal quotations omitted) (emphasis added and in original).

**ARGUMENT**

**I.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES FALSE OR MISLEADING STATEMENTS**

The Amended Complaint identifies four materially false or misleading statements made on January 28: (i) Taronis had a contract with the City of San Diego; (ii) the City elected to use MagneGas2 as its metal cutting fuel of choice; (iii) the City would begin the immediate adoption of the fuel products; and (iv) the decision to adopt MagneGas2 was a major milestone in the Company's growth efforts in California. ¶¶39-41. These disclosures are actionable because, at the time they were made: (i) Taronis *did not* have a contract with the City; (ii) the City *had not* elected to use MagneGas2 as its metal cutting fuel of choice; (iii) the City *was not* going to begin the immediate adoption of the fuel products; and (iv) the decision to adopt MagneGas2 was not a major milestone in the Company's growth efforts in California because *no such decision had been authorized*. ¶56.

Moreover, the allegations are supported by the following facts illustrating that: (i) there was *never* a contract with the City, ¶¶5-7, 60-64, 66-67, 76; (ii) Mahoney *knew* that no contract existed because he did not approve it before the January 28 announcement, ¶¶23, 95-96, 115-17; (iii) in authorizing the January 28 disclosures, the Individual Defendants' intended to create a false perception of a burgeoning relationship with the City, ¶¶38, 42-52, 58, 114, 117; and (iv) immediately after the City learned of the January 28 press release, its employees expressed immediate shock, determined that the statements therein were false and demanded and obtained Taronis's agreement to take the press release down. ¶¶66-70 & Exs. A-B. The facts also show that, even after being confronted by City employees, the Individual Defendants *continued* to conceal the truth about the contract from investors. ¶¶50-52, 71, 89-90, 95-97.[2]

---

[2] In fact, the Defendants did not and, to date, have not disclosed the emails exchanged between Taronis and the City of San Diego to investors.

To plead falsity, a plaintiff must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1)(B). "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (citation and internal quotations omitted). "[A] misrepresentation or omission is material if there is a substantial likelihood that a reasonable investor would have acted differently if the misrepresentation had not been made or the truth had been disclosed." *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005).

The federal securities laws "do not create an affirmative duty to disclose any and all material information. Disclosure is required … only when necessary 'to make … statements made, in light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)). "But, 'once defendants [determine] to tout' positive information to the market, 'they [are] bound to do so in a manner that wouldn't mislead investors,' including disclosing adverse information that cuts against the positive information." *Schueneman,* 840 F.3d at 706 (quoting *Berson,* 527 F.3d at 987). *See United States v. Laurienti*, 611 F.3d 530, 539 (9th Cir. 2010) (citation and internal quotations omitted) (Rule 10b-5(b) "prohibits the telling of material lies and … material half-truths, where the speaker omit[s] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.").

Construing all reasonable inferences from the well-pled facts in Plaintiff's favor, the Amended Complaint plausibly alleges that the January 28 disclosures were false or misleading. *See Maverick Fund, L.D.C. v. First Solar, Inc.*, 2018 U.S. Dist. LEXIS 200402, at *26-27 (D. Ariz. Nov. 27, 2018) (citing *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959 (9th Cir. 1996) (finding statements actionable because defendants knew of statements' falsity or tendency to mislead). Even if the statements in the January 28 disclosures were not literally false, "[t]he veracity of a statement or omission is measured

not by its literal truth, but by its ability to accurately inform rather than mislead prospective buyers." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (citation and internal quotations omitted). The January 28 disclosures did not accurately inform prospective purchasers about the true state of affairs between Taronis and the City; rather, they operated to mislead investors. ¶¶1, 42-46, 52, 54, 58, 119-20. Further, by failing to disclose information to investors during the January 31 conference call to make prior statements not misleading, Mahoney affirmatively reinforced "an 'impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed].'" *Reese v. Malone*, 747 F.3d 557, 570 (9th Cir. 2014), *overruled on other grounds by City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605 (9th Cir. 2017) (quoting *Berson,* 527 F.3d at 985). Specifically, Taronis announced a "contract [whereby San Diego would] immediately begin adoption of" its fuel products, which constituted a "major milestone." ¶41. City of San Diego employees were immediately shocked at the announcement: "the City … does NOT have a contract with this company. … This is appalling that they'd get this so wrong." ¶60. And immediately thereafter, the same facts were recounted back to Taronis: "The City of San Diego does not have any procurement contract or any agreement with [Taronis] to purchase any of its products." ¶67. Taronis belatedly "correct[ed] its prior disclosure" and conceded that it did "not have any formal binding contracts, agreements or long-term purchase commitments with the City of San Diego." ¶76.  In short, there was no contract at the time the Defendants announced the existence of a contract.

Incredibly, the Defendants dispute these allegations (which must be accepted as true) and argue that Plaintiff's 10b-5 claim should be dismissed because "Taronis did have a contract with the City of San Diego" because it had "an approval and a written authorization … to move forward with the procurement of gas" which would be "later memorialized in a purchase order" which the Company purportedly "treats […] as contracts." Mot. at 7, 9, 10.  But this argument flies in the face of the plain facts alleged in the Amended Complaint: (i) "the City … does NOT have a contract with this company

… this is appalling that they'd get this so wrong." ¶60; (ii) "the City of San Diego does not have any procurement contract or any agreement with [Taronis] to purchase any of its products." ¶67; and (iii) Taronis did "not have any formal binding contracts, agreements or long-term purchase commitments with the City of San Diego." ¶76. The Defendants' argument also flies in the face of the most basic legal concepts. A contract is an "agreement between two or more persons which creates an obligation to do or not to do a particular thing." Black's Law Dictionary, Sixth Edition. As set forth above, there was **no agreement** between Taronis and the City of San Diego, and San Diego had **no obligation** to do **anything** as a consequence.[3]

Furthermore, even if Taronis had received "approval and written authorization to move forward" (and it did not), an approval is not a contract. *See, e.g*., City of San Diego Purchase Order Guidelines, Complete Agreement, *available at* https://www.sandiego.gov/purchasing/vendor/purchaseorder (emphasis added) ("Upon acceptance by the City of San Diego, a solicitation, bid, proposal, or price quotation *and the resulting Purchase Order* shall be deemed a binding contract.")  Indeed, the City's emails with Taronis establish that there was **no approval** at any relevant time. ¶¶78, 92-93 & Ex. C. Additionally, the Defendants conceded that "[T]he Company **does not** have any formal binding contracts, agreements or long-term purchase commitments with the City of San Diego beyond the existing approval."  ¶76 (quoting Form 8-K/A) (emphasis added).  And the argument that Taronis had a "purchase order" fares no better.  Mot. at 1, 7, 9, 10.  A purchase order is also a term of art, and constitutes an "offer which is accepted when the vendor supplies the quantity and quality ordered."  Black's Law Dictionary.  But there was no offer and no acceptance because Taronis did "**not** have any formal binding contracts, agreements or long-term purchase commitments with the City

_____

[3] The City of San Diego's "disagreement with [the] use of the term 'contract'" by Taronis in the press release is, consequently, of great significance because it indicates that there was clearly **no meeting of the minds** between the parties to the purported contract.  Mot. at 8.

of San Diego." *See also, e.g.,* City of San Diego, Purchasing & Contracting: Goods and Services Contracts FY19, *available at* https://www.sandiego.gov/purchasing/bids-contracts/contracts (last visited Nov. 26, 2019) (list of purchase orders from July 11, 2018 through February 25, 2019 for goods and services contracts with the City valued at more than $25,000 which ***does not include*** Taronis or its predecessor company).

Pointing to the emails attached to the Amended Complaint, the Defendants also speculate that the City "disagree[d] with Taronis's use of the term 'contract,'" over the concern that it "connote[s] some sort of long-term commitment." Mot. at 8. The Defendants argue that the disagreement "does not make the January 28 press release actionable." *Id*. This strawman argument fails as well because the emails plainly illustrate that there was never any contract with the City. The reasonable inferences from the emails support Plaintiff's allegations that the January 28 disclosures are false or misleading. The emails do not support the argument that the City's "disagreement" merely concerned semantic wordsmithing.[4]

The Defendants also argue that Taronis's removal of the January 28 press release is not an indication of falsity. *See* Mot. at 9. But the reasonable inference is that the press release was removed precisely because it ***was*** false. ¶67. Moreover, the Defendants ***never*** challenged the City over its assertion of falsity. ¶68 & Ex. B at 2 (Jan. 29, 2019 email from T. Patel to S. Robinson, et al., "[W]e apologize for any inconvenience and we've begun the process of retraction. Additionally, I've copied in … Scott Mahoney, who … is interested … to discuss your existing relationship with [Taronis] and what you would be comfortable with us disclosing going forward.").

Lastly, the Defendants challenge whether Plaintiff's "conclusory" allegation that "Taronis had not even begun any official process of becoming an approved vendor … for

---

[4] Defendants' authority is inapposite. *See, e.g., Lomingkit v. Apollo Educ. Grp. Inc.*, 275 F. Supp. 3d 1139, 1155 (D. Ariz. 2017) (finding that multiple definitions of term "rollout" in operative pleading "contradict one another and make it impossible … to conclude that Plaintiffs have plausibly pleaded falsity").

the City," Mot. at 10, supports the claim that the January 28 disclosures are false or misleading. First, the allegation is not conclusory because it is supported by facts demonstrating the absence of any vendor relationship between Taronis and the City. ¶60 ("The City … does NOT have a contract with this company. … This is appalling that they'd get this so wrong."), Ex. A at 1 (same) & Ex. A at 2 (Jan. 29, 2019 email from K. Keach to B. Hawthorne, et al., ("[I]t is very disappointing [Taronis would] be so careless in not knowing who their client is.")). Second, the reasonable inferences from the alleged absence of any vendor relationship with the City support Plaintiff's allegations.

Because the Amended Complaint plausibly alleges that the January 28 disclosures were false or misleading, the Motion should be denied.

## II.     THE AMENDED COMPLAINT RAISES A STRONG INFERENCE OF SCIENTER

The Amended Complaint adequately alleges that, in making false or misleading statements in the January 28 disclosures, Mahoney acted with a "mental state embracing intent to deceive … or defraud," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 n.3 (2007), or deliberate recklessness. *Schueneman*, 840 F.3d at 705 (citation omitted). "Scienter may be established … by showing that the defendants knew their statements were false, or by showing that defendants were [deliberately] reckless as to the truth or falsity of their statements." *Gebhart v. SEC*, 595 F.3d 1034, 1041 (9th Cir. 2010) (citations omitted). *See New Enters. v. SenesTech, Inc.*, 2019 U.S. Dist. LEXIS 139012, at *24 (D. Ariz. Aug. 16, 2019) (citation and internal quotations omitted) ("Knowing or intentional conduct satisfies the required state of mind to find scienter in a securities fraud action."). It also may be shown through direct or circumstantial evidence. *See Tellabs*, 551 U.S. at 324. "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants … engaged in deliberately illegal behavior; … knew facts or had access to information suggesting that their public statements were not accurate … or … failed to check information they had a duty to

monitor." *Employees' Ret. Sys. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (citations and internal quotations omitted).

A court must accept the factual allegations in a complaint as true and assess them "holistically" to decide whether "a reasonable person [would] deem the inference of scienter at least as strong as any opposing inference." *Tellabs,* 551 U.S. at 326; *see In re Quality Sys.*, 865 F.3d 1130, 1144 (9th Cir. 2017). The analysis in the Ninth Circuit involves a dual inquiry. *See Maverick Fund, L.D.C.*, 2018 U.S. Dist. LEXIS 200402, at *33 (quoting *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)). The Court must first determine whether any single allegation is "sufficient to create a strong inference of scienter; [and] second, if no individual allegation is sufficient, [the Court] must conduct a 'holistic' review of [all] allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *N.M. State Inv.*, *supra*. "In assessing the allegations holistically … the federal courts certainly need not close their eyes to circumstances that are probative of scienter viewed with a practical and common-sense perspective." *South Ferry LP #2 v. Killinger,* 542 F.3d 776, 784 (9th Cir. 2008).

A "strong inference" is one that is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. Where there is a fifty-fifty chance that the defendant knew about the alleged fraud, or was severely reckless as to the truth, the draw must go to plaintiff. *Id.* "Where, as here, falsity and scienter are 'strongly inferred from the same set of facts,' [the Court] may 'incorporate[] the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry,' asking 'whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentionally or [with] deliberate recklessness made false or misleading statements to investors.'" *In re Allied Nev. Gold Corp. Sec. Litig.*, 743 F. App'x 887 (9th Cir. 2018) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).

Contrary to the Defendants' contention, *see* Mot. at 12, Plaintiff's primary scienter theory is that Mahoney and Taronis (through Mahoney) acted with knowledge, intent, or deliberate recklessness in making and disseminating false or misleading statements in the January 28 disclosures because there was, quite simply, no contract at that time. The Amended Complaint presents facts consistent with that theory giving rise to a strong inference of scienter. *See, e.g., Reese*, 747 F.3d at 571 (citing *Berson*, 527 F.3d at 987) (holding that defendant's knowledge that her statement was materially misleading was sufficient to support a strong inference of scienter).

The Amended Complaint plausibly alleges that Mahoney ***knew*** there was no contract with the City when he made and disseminated the January 28 disclosures in the name of the Company, ¶¶56, 58, 95-96, 117, and that Mahoney, among others, acted with actual knowledge or intent to deceive.[5]  ¶¶87, 117. After Taronis was confronted by the City about the falsity of the January 28 press release, Mahoney ***continued*** to deceive investors participating on the January 31 conference call about the existence of the contract with the City. ¶¶50-52, 70-71, 88-90 & Ex. B. *See Nursing Home Pension Fund, Local 144 v. Oracle Corp.,* 380 F.3d 1226, 1230 (9th Cir. 2004) (emphasis added) ("The most direct way to show both that a statement was false when made and that the party making the statement knew that it was false *is via contemporaneous reports or data, available to the party, which contradict the statement.*"). Even if Mahoney did not possess actual knowledge (and the Amended Complaint amply alleges that he did), his actions give rise to a strong inference of deliberate indifference as to the possibility of misleading investors. *See In re Impinj, Inc. Sec. Litig.*, 2019 U.S. Dist. LEXIS 172802, at *18 (W.D. Wash. Oct. 3, 2019).[6]

[5] While the Individual Defendants collectively approved the January 28 disclosures for filing and public dissemination in the name of Taronis, ¶¶23, 38-41, 56-58, and acted with the same culpable state of mind, Dingess, Santilli, Pollack, and Staunton were not the makers of the alleged false or misleading statements.

[6] A strong inference of scienter is also raised by the self-interested motives of the Individual Defendants, including Mahoney, in delaying the issuance of a corrective

These allegations provide strong circumstantial evidence that Mahoney acted with conscious misconduct or was deliberately reckless. The allegations further provide a strong inference of scienter that is cogent and at least as compelling as an opposing inference one could draw from the facts alleged. The inference that Mahoney acted knowingly, intentionally, or with deliberate recklessness, is far more compelling that any opposing inference the Defendants offer.

The Defendants argue that Plaintiff's theory of scienter is outweighed by a purportedly more compelling inference of non-fraudulent intent. *See* Mot. at 16-17. But this competing theory is based on a specious chain of hypothetical counterfactuals: (i) "Taronis secured a purchase order from the City" and "made the prudent business judgment to take the [January 28] press release down" "presumably" and "perhaps" because the City "took issue" with the use of the term "contract." *Id*. at 17. But there is nothing compelling about this utterly hypothetical narrative, and it is certainly not more compelling than the competing inference of scienter set forth above.

The Defendants also argue that the January 28 disclosures were "not needed to boost the price of Taronis's stock to comply with NASDAQ's minimum bid price rule [since the] reverse stock split would result in a stock price far above $1.00." *Id*.[7] But that argument ignores the Company's dilutive secondary stock offering, ¶55,[8] and also

---

disclosure following the demand by the City that the January 28 press release be immediately taken down. ¶¶80, 91. *See, e.g., Crago v. Charles Schwab & Co.*, 2017 U.S. Dist. LEXIS 215871, at *17 (N.D. Cal. Dec. 5, 2017) (while allegations of self-interested motive, standing alone are insufficient to support a finder of scienter, coupled with other allegations they satisfy the scienter requirement at the pleading stage).

[7] Plaintiff is contemporaneously filing a response to the Defendants' request for judicial notice and incorporation by reference.

[8] The Defendants further argue that Plaintiff's scienter "theory is illogical" because "Taronis stock would have been trading well above the $1 minimum bid price as a result of the reverse stock split." Mot. at 12. This argument ignores: (i) the February 6, 2019 dilutive secondary stock offering which had the likely effect of decreasing the share price of Taronis stock; and (ii) that Taronis's stock price did, in fact, trade below the $1 per share threshold in any event by February 11, 2019 – just one day before Taronis announced that it did not have a contract with the City of San Diego.

ignores that the price for Taronis common stock began to slide precipitously as the market grew uncertain about the actual existence of a contract with the City, days *before* the secondary stock offering was announced. ¶¶54, 73, 75, 76, 79.

Even if the Court was to determine that the false January 28 announcement standing alone falls short of raising a strong inference, any perceived deficiency is eliminated when viewed holistically with facts showing Mahoney's actions to conceal or cover up wrongdoing. *See In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1154, 1166-67 (D. Or. 2015) (citations omitted) (evidence that defendant has taken steps to cover up misconduct is strong proof of scienter).  For example, the Form 8-K/A filing signed by Mahoney provides strong circumstantial evidence of scienter because the Amended Complaint plausibly alleges that Mahoney ***knew*** there was no approval with the Fleet Department when he made and, with the approval of Individual Defendants, publicly disseminated the Form 8-K/A. ¶¶76-77, 78, 93 & Ex. C at 1.  Furthermore, Mahoney failed to disabuse investors of the belief that there was a contract during the January 31st conference call despite contemporaneous knowledge to the contrary. ¶¶50-52.  Finally, the corrective press release issued on February 12 came just one business day after the Company's shares dropped below the required $1 per share threshold, providing additional strong circumstantial evidence of scienter.  ¶75.

Defendants' post-Class Period misconduct is also probative of scienter. In the 2018 Annual Report, Taronis falsely claimed that the price of its common stock fell below $1.00 due to uncontrollable market conditions, rather than from the uncertainty injected into the marketplace following: (i) the removal of the January 28 press release from the Taronis website without explanation; and (ii) a corrective disclosure which revealed that the prior disclosure was fiction. ¶¶71, 73-74, 76, 82-83, 94. Mahoney's false statements during an August 19 Second Quarter Earnings Call similarly provide a strong inference of scienter. ¶98. During the call Mahoney claimed that Taronis "had a purchase order from three different departments from the [C]ity." ¶84. The allegations in the Amended Complaint show that at ***no relevant time*** did Taronis receive a purchase order

- 15 -

from the Fleet Department. ¶¶78, 92-93. The knowingly false claim that Taronis "had a purchase order from three different departments from the [C]ity" made after this litigation was commenced, further support a strong inference of scienter. *See In re Galena Biopharma, Inc. Sec. Litig., supra.*[9]

Because the Amended Complaint plausibly alleges a strong inference of scienter that is cogent and at least as compelling as any opposing inference, the Motion should be denied.

## III. THE AMENDED COMPLAINT ADEQUATELY ALLEGES LOSS CAUSATION

In *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018), the Ninth Circuit set forth the standard for pleading loss causation and explained that the plaintiff has the burden of proving that the defendant's alleged misconduct "caused the loss for which the plaintiff seeks to recover damages." But because the "inquiry requires no more than the familiar test of proximate cause," the plaintiff "need only show a causal connection between the fraud and the loss by tracing the loss back to the very facts about which the defendant lied." *Id.* at 753 (citations and internal quotations omitted). "Because loss causation is simply a variant of proximate cause, the ultimate issue is whether the defendant's misstatement, as opposed to some other fact, foreseeably caused the plaintiff's loss." *Id.* (citation and internal quotations omitted).

"Loss causation is a 'context dependent inquiry as there are *an infinite variety of ways* for a tort to cause a loss.'" *Maverick Fund, L.D.C.*, 2018 U.S. Dist. LEXIS 200402, at *27 (quoting *First Solar Inc., supra*) (emphasis added). It can be satisfied simply "by showing that the defendant misrepresented or omitted the very facts that were a substantial factor in causing the plaintiff's economic loss." *Id.* at *27-28 (citation and

---

[9] The Defendants also argue that the Amended Complaint "includes no confidential witness allegations." Mot. at 16. But the Amended Complaint far surpasses that standard; it attaches actual emails from the City of San Diego ***itself*** illustrating that there was no contract. In this way, the primary witness need not be confidential because the original source information is already available.

internal quotations omitted). *See Livid Holdings Ltd*., 416 F.3d at 949 (loss causation sufficiently alleged when plaintiff asserted that it would not have purchased the stock but for the misrepresentation and that the misrepresentation was causally related to plaintiff's actual economic loss). Loss causation can be adequately pled if "a plaintiff shows the misrepresentations affected the financial health of an entity and, consequently, *the value of the plaintiff's stock* …." *SenesTech Inc*., 2019 U.S. Dist. LEXIS 139012, at *27 (citation omitted). "Disclosure of the fraud is not a *sine qua non* of loss causation, which may be shown even when the alleged fraud is not necessarily revealed prior to the economic loss." *First Solar Inc., supra*. (citations and internal quotations omitted).

The Amended Complaint plausibly alleges loss causation as "[t]he steps in the causal chain are all plausible and foreseeable." *See In re Impinj, Inc. Sec. Litig*., 2019 U.S. Dist. LEXIS 172802, at *20. The Amended Complaint alleges that the Defendants' false or misleading statements misrepresented the true nature of Taronis's business relationship with the City (*i.e*., its financial circumstances and future business prospects), resulting in Plaintiff's purchase of Taronis stock at artificially inflated prices. ¶¶2-4, 41-46, 54, 58, 119-20, 130-31. The Amended Complaint alleges that the fraud was revealed to the marketplace through a leaking and then corrective disclosure, which caused the price of Taronis stock to drop precipitously. It also alleges that but for the Defendants' actions, misstatements, and omissions, Plaintiff would not have purchased the stock. ¶¶8, 67-69, 70-76, 79-81, 103-05, 121, 132. As the revelatory disclosures are causally related to the Defendants' false and misleading statements, Plaintiff's allegations raise a plausible inference of loss causation. *See Sierp v. DeGreen Partners LP*, 2017 U.S. Dist. LEXIS 2223, at *34 (D. Ariz. Jan. 6, 2017) (cited in *SenesTech Inc.,* 2019 U.S. Dist. LEXIS 139012, at *28) (explaining that the complaint is satisfactory at the pleading stage if it "offers sufficient detail to give defendants ample notice of [the] loss causation theory, and [gives] some assurance that the theory has a basis in fact").

The Defendants' argument that the decline in Taronis's stock price is related *only* to the reverse stock split lacks merit because it contradicts Plaintiff's well-pled

allegations showing otherwise. *See* Mot. at 19. For example, the Defendants argue that "[n]owhere does Taronis reveal 'there was no contract [. . . .]'" *Id*. at n.11. But that is ***precisely*** what the Amended Complaint alleges is revealed at the end of the Class Period: Taronis announced that it did "not have any formal binding contracts, agreements or long-term purchase commitments with the City of San Diego." ¶76 (quoting Feb. 12 Form 8-K/A). The argument also misapprehends Plaintiff's pleading burden which requires a showing that the alleged fraud was a substantial cause of the loss; Plaintiff need ***not*** show that it was the ***only*** reason for the drop in share price. *See In re Impinj, Inc. Sec. Litig*., 2019 U.S. Dist. LEXIS 172802, at \*19. Even assuming that the decline in the stock price is attributable in part to other unrelated factors, the loss causation allegations survive. *See In re Allied Nev. Gold Corp. Sec. Litig*., 743 F. App'x at 888 (quoting *In re Daou Sys., Inc*., 411 F.3d 1006, 1025 (9th Cir. 2005)) ("[W]hile [the drop in] the price of gold may have been a contributing factor, plaintiff has adequately alleged that the [corrective] disclosure was at least 'one substantial cause' of the stock decline at the time.").

Because the Amended Complaint plausibly alleges loss causation, the Motion should be denied.

## IV.    THE AMENDED COMPLAINT ADEQUATELY ALLEGES A SCHEME LIABILITY CLAIM

The Defendants' arguments in support of the motion to dismiss the 10b-5(a) and (c) "scheme liability" claim in the Amended Complaint against the Individual Defendants are without merit as set forth below.

### A.    Plaintiff Alleges that the Individual Defendants are Liable for Disseminating False or Misleading Statements to Investors

Defendants argue that Plaintiff's scheme liability claim against Dingess, Santilli, Pollack, and Staunton should be dismissed because none of these Defendants "actually made any challenged statement." Mot. at 20. But the Amended Complaint does not interpose a scheme liability claim against any of the Defendants for making false or

misleading statements in the January 28 disclosures. Rather, the claim arises from the Individual Defendants' participation in: (i) the scheme to misrepresent the existence of a material contract between Taronis and the City and artificially inflate Taronis's stock price; (ii) the preparation and dissemination of the false or misleading January 28 disclosures; and (iii) the decision to not timely issue a corrective disclosure until after Taronis failed to comply with the minimum price bid. ¶¶40, 57-58, 126.

As recognized by the United States Supreme Court, "dissemination of false or misleading statements with the intent to defraud can fall within the scope of [10b-5(a) and (c)] …." *Lorenzo v. SEC*, 139 S. Ct. 1094, 1100 (2019). "[T]hat is so even if the disseminator did not 'make' the statements and consequently falls outside of [10b-5(b)]." *Id*. at 1101. In *Lorenzo*, the Supreme Court found that the petitioner employed a device within the meaning of 10b-5(a) and engaged in an act, practice or course of business and operated as a fraud or deceit under 10b-5(c), by sending emails to investors which he knew to contain material untruths. *Id*. The Court further determined that "[t]hose who disseminate false statements with the intent to defraud are primarily liable under [10b-5(a) and (c)] … even if they are secondarily liable under [10b-5(b)]." *Id*. at 1105. *Accord In re CytRx Corp. Sec. Litig*., 2015 U.S. Dist. LEXIS 91447, at *41-46 (C.D. Cal. July 13, 2015) (noting that 10b-5(b) "maker" limitation in *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011) "is inapplicable to scheme liability claims" and finding that plaintiff's allegations that defendants "participated in the preparation of and/or disseminated or approved" false or misleading statements and "engaged … in a course of conduct to conceal the truth," stated a 10b-5(a) and (c) claim).

**B.    Plaintiff Alleges the Individual Defendants' Misconduct with Particularity**

The Defendants argue that "Plaintiff fails to plead with particularity the role any of these Defendants played with respect to any particular challenged statement." Mot. at 20. This argument is no more availing as the Amended Complaint plausibly alleges that each of the Individual Defendants participated in the scheme to defraud, reviewed the false or

misleading disclosures, approved their dissemination, and engaged … in a course of conduct to conceal the truth. ¶¶40, 57-58, 126. These allegations are sufficient to state a 10b-5(a) and (c) claim. *See In re CytRx Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 91447, at *41-43 (allegations that defendants "participated in the preparation of and/or disseminated or approved" false or misleading statements and "engaged in a course of conduct to conceal the truth" … "are sufficient to survive dismissal").

### C. Plaintiff Alleges a Strong Inference of Scienter

Plaintiff's allegations present a strong showing that the Individual Defendants were engaged in a scheme to defraud investors. Plaintiff's allegations demonstrate that the Individual Defendants, as Board members, were involved in the effort to prevent the delisting of Taronis common stock, ¶¶26-37, and had access to information concerning the claimed contract with the City. ¶¶38, 40, 57-58, 65, 80, 95-97.

Pursuant to the Code, Mahoney was charged with reviewing and approving all contracts with any government entity, including the City. It would be "absurd" to suggest that Mahoney lacked knowledge that a contract with the City did not actually exist when he was responsible for approving it in the first instance. *See Berson*, 527 F.3d at 988; *S. Ferry LP*, 542 F.3d at 785-86.

Individual Defendants Dingess, Mahoney, Pollack, and Staunton, as members of the Board, were each involved in the efforts on behalf of Taronis to avoid delisting from NASDAQ. It would be absurd to suggest that the Individual Defendants did not discuss the purported existence of Taronis's first major city contract for the adoption of MagneGas2, particularly in light of the threat of delisting. *Id. See No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 942-43 & n.21 (9th Cir. 2003) (cited in *Berson*, 527 F.3d at 987-88) (holding that plaintiffs' allegations inferring outside directors' knowledge of maintenance problems for which they had no direct management responsibility was sufficient to raise a strong inference of scienter). Moreover, the Individual Defendants approved the January 28 disclosures for filing and public dissemination knowing that there was no contract with the City of San

Diego or deliberately indifferent as to the actual existence of the contract. It would also be absurd to suggest that the Individual Defendants did not discuss: (i) the emails from the City stating that the press release was false because there was not any contract; and (ii) the decision to remove the January 28 press release from the Taronis website.

Individual Defendants Dingess, Pollack, and Staunton, as members of the Audit Committee, were charged with, among other things, reviewing and approving Taronis's public filings and ensuring compliance with the Code. ¶¶23, 95, 97.[10] It would similarly be "absurd" to suggest that no Audit Committee member discussed the "contract" prior to the filing and public dissemination of the January 28 disclosures, Taronis's response to remove the press release from the website, or whether and when to file to file a corrective disclosure. *See Berson*, 527 F.3d at 988; *S. Ferry LP*, 542 F.3d at 785-86. *See also Reese*, 747 F.3d at 576-77.

These facts demonstrate that the Individual Defendants acted with the requisite culpable state of mind in approving and disseminating the January 28 disclosures.

_____

[10] The Audit Committee assists the Board:

> [I]n its general oversight of, among other things, the Company's policies, guidelines and related practices regarding risk assessment and risk management, including the risk of fraud. As part of this endeavor, the Audit Committee reviews and assesses the Company's major financial, legal, regulatory, environmental and similar risk exposures and the steps that management has taken to monitor and control such exposures. *The Audit Committee also reviews and assesses the quality and integrity of the Company's public reporting, the Company's compliance with legal and regulatory requirements … the effectiveness of the Company's disclosure controls and procedures and the adequacy and effectiveness of the Company's risk management policies and related practices*.

2018 Annual Report (Apr. 12, 2019) at 42, *available at* https://www.sec.gov/Archives/edgar/data/1353487/000149315219005182/form10k.htm#a_002 (emphasis added). Plaintiff respectfully requests that the Court take judicial notice of the foregoing statement of Audit Committee duties in the 2018 Annual Report. *See Northstar Fin. Advisors, Inc. v. Schwab Invs.,* 779 F.3d 1036, 1043 (9th Cir. 2015) (appropriate to take judicial notice of documents made available by SEC and where neither part disputes the authenticity of documents or information therein); Fed. R. Evid. 201(b).

### D.    Plaintiff's 10b-5(a) and (c) Claim Encompasses Conduct Beyond His 10b-5(b) Claim

Defendants argue that Plaintiff's 10b-5(a) and (c) claim does not plead facts separate from those already alleged in the 10b-5(b) claim. The argument is without merit. *See* § IV.A, *supra* (citing ¶¶40, 57-58, 126) (Plaintiff's scheme "claim arises from the Individual Defendants' participation in: (i) the scheme to misrepresent the existence of a material contract between Taronis and the City and artificially inflate Taronis's stock price; (ii) the preparation and dissemination of the false or misleading January 28 disclosures; and (iii) the decision to not timely issue a corrective disclosure until after Taronis failed to comply with the minimum price bid."); § IV.B, *supra* (citing ¶¶40, 57-58, 126) (The Amended Complaint "alleges that each of the Individual Defendants participated in the scheme to defraud, reviewed the false or misleading disclosures, approved their dissemination, and engaged in a course of conduct to conceal the truth."). This conduct is separate from the alleged misrepresentations and omissions by Mahoney and is sufficient to support a scheme liability claim. *See Rabkin v. Lion Biotechnologies, Inc.*, 2018 U.S. Dist. LEXIS 25326, at *50-53 (N.D. Cal. Feb. 15, 2018); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d at 1193-95.

### CONCLUSION

For the reasons set forth above, Plaintiff respectfully requests that the Motion be denied in its entirety.

Dated: November 27, 2019

           /s/ Matthew M. Guiney
Matthew M. Guiney (admitted *pro hac vice*)
guiney@whafh.com
Malcolm T. Brown (admitted *pro hac vice*)
brown@whafh.com
Kevin G. Cooper (admitted *pro hac vice*)
kcooper@whafh.com
WOLF HALDENSTEIN ADLER
 FREEMAN & HERZ LLP
270 Madison Avenue
New York, NY 10016
Tel: (212) 545-4600
Fax: (212) 686-0114

*Lead Counsel for Lead Plaintiff Kui Zhu
and the Proposed Class*


JOHNSTON FISTEL LLP
Michael I. Fistel, Jr.
michaelf@johnsonfistel.com
40 Powder Springs Street
Marietta, GA 30064
Tel: (470) 632-6000
Fax: (770) 200-3101

*Additional Counsel for Lead Plaintiff Kui Zhu*

/807149

- 23 -

**CERTIFICATE OF SERVICE**

I hereby certify that on November 27, 2019, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system and served electronically through the CM/ECF system to all counsel of record.

$\underline{\qquad\text{/s/ Matthew M. Guiney}\qquad}$
Matthew M. Guiney