**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Kui Zhu, et al., | No. CV-19-04529-PHX-GMS |
| Plaintiffs, | **ORDER** |
| v. | |
| Taronis Technologies Incorporated, et al., | |
| Defendants. | |

Pending before the Court is Defendants Taronis Technologies, Inc.[1] ("Taronis" or "Company"), Robert L. Dingess, Scott Mahoney, Ermanno P. Santilli, Kevin Pollack, and William W. Staunton (collectively "Defendants") Motion to Dismiss First Amended Class Action Complaint. (Doc. 45.) The Court held oral argument on this matter on February 21, 2020. Having read the parties briefing and heard their arguments, the Motion will be granted in part and denied in part.

## BACKGROUND

This action concerns an alleged fraudulent scheme to artificially inflate the market price of Taronis common stock by deceiving the investing public about the existence of a material contract between Taronis and the City of San Diego. This federal securities class action is brought on behalf of all persons or entities who purchased or otherwise acquired Taronis common stock between January 28, 2019 and February 12, 2019 ("Plaintiffs") when the stock prices were allegedly artificially inflated.

---

[1] Taronis Technologies, Inc. was formerly named MagneGas Applied Technology Solutions, Inc. The Company changed its name on January 31, 2019.

Taronis is an energy company that offers technology solutions to create, process, and produce hydrogen-based fuel.[2] Taronis has had difficulty maintaining its listing on NASDAQ. On May 7, 2018, NASDAQ informed Taronis that to avoid delisting it needed to, among other things, maintain its common stock price above $1.00 for ten consecutive business days. To ensure compliance, Taronis's Board of Directors obtained the consent of Taronis's majority stockholders to approve a reverse stock split of the outstanding common stock and treasury stock. The reverse stock split was anticipated to result in an immediate increase in the market price of the common stock to an average of $4.20—well above the Nasdaq $1.00 minimum. The reverse stock split went into effect on January 30, 2019. Plaintiffs concede this method of boosting Taronis's stock price was lawful.

However, Plaintiffs allege Defendants were simultaneously planning a fraudulent means of inflating the stock price. On January 28, 2019 Taronis disclosed in an SEC filing and related press release ("Press Release") that the City of San Diego (the "City") elected to use Taronis's MagneGas2 as its fuel of choice. In pertinent part, the Press Release stated:

### City of San Diego Adopts MagneGas Metal Cutting Fuel

*Major New Client Win Southern California*

TAMPA, Fla., Jan. 28, 2019 -- MagneGas Applied Technology Solutions, Inc. ("MagneGas" or the "Company") (NASDAQ: MNGA), a leading clean technology company in the renewable resources and environmental solutions industries, announced today that the City of San Diego has elected to use MagneGas as its metal cutting fuel of choice, marking the first major city contract for the adoption of our metal cutting fuels. The City of San Diego has historically used acetylene to maintain a wide range of equipment used for waste removal, maintenance and infrastructure support and as of this contract, the City will immediately begin adoption of MagneGas' cleaner and safer fuel products. . . .

(Doc. 36 at 8.) Plaintiffs allege that the market price of Taronis common stock promptly increased over 25% after news of the San Diego contract was published.

However, the day after the Press Release was published, the City's Senior Public Information Officer requested that the Press Release be immediately removed. The City

---

[2] Defendants Dingess, Mahoney, Santilli, Staunton, and Pollack (collectively "Individual Defendants") sit on Taronis Board of Directors. Defendant Mahoney served as Taronis Chief Executive Officer and President. Defendants Dingess, Pollack, and Staunton also served on the Board's Audit Committee.

Officer explained, "while the product has been tested the City of San Diego does not have any procurement contract or any agreement with [Taronis] to purchase any of its products." (Doc. 36 at 15.) Plaintiffs also cite internal emails from the City stating that "[t]he [Taronis] news release . . . is incorrect. The City of San Diego does NOT have a contract with this company. . . . This is appalling that they'd get this so wrong." (Doc. 36 at 14.)

Pursuant to the City's request, the Press Release was later removed from Taronis's website, but no corrective disclosure was filed with the SEC. Investors quickly commented on social media regarding the sudden disappearance of the Press Release from the Company's website. One investor noted, "[t]he announcement on the website disappeared though. . . . What happened?" Another explained, "I was told they published news that they signed a deal with the city of San Diego & the mayor made them take down the news because it wasn't true. Beware." By February 11, 2019 Taronis stock price again fell below the NASDAQ $1.00 minimum. On February 12, 2019, Taronis filed a Form 8-K/A with the SEC that explained,

> On January 28, 2019, Taronis Technologies, Inc., formerly known as MagneGas Applied Technology Solutions, Inc. (the "Company") issued a press release and filed a corresponding Current Report on Form 8−K with the SEC, which stated that the City of San Diego had elected to use MagneGas2 as its metal cutting fuel of choice and that this was the first major city contract for the adoption of the Company's metal cutting fuels. The Company has determined that it is necessary to correct its prior disclosure. The Company has an approval and a written authorization from the City of San Diego's Fleet Operations to move forward with the procurement of gas and other hard goods from the Company at three different locations within the City. This procurement covers more than one division within the municipality, and was received from a city official with sufficient authority to approve the procurement process. In the welding supply and gas distribution business purchases and sales of hard goods and gases are typically made through a process whereby a purchaser receives a quote for goods from the seller and then places an order which is later memorialized in a purchase order. The Company treats purchase orders as contracts and made its prior disclosure with that treatment in view, however, the Company does not have any formal binding contracts, agreements or long−term purchase commitments with the City of San Diego beyond the existing approval, nor any commitment that any of the Company's products will be purchased as the products of choice for their respective applications.

(Doc. 36 at 18.)

Plaintiffs rely on the quoted materials to allege that "the Company's disclosure about the contract with the City of San Diego was entirely false. Taronis had not entered

into any contract with the City of San Diego for its proprietary metal-cutting fuel; nor was the City adopting the Taronis product as its metal-cutting fuel of choice." (Doc. 36 at 2-3.) Plaintiffs claim that Defendants knew the Press Release was false but released it to artificially inflate the common stock price. Plaintiffs allege that Defendants waited until February 12, 2019 to clarify the Press Release in an attempt to obtain compliance with NASDAQ's minimum bid price for the required ten consecutive business days. Consequently, the First Amended Complaint ("FAC") alleges claims for (1) violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) against Defendant Taronis and Defendant Mahoney (Count I); and (2) violations of SEC Rule 10b-5(a) &(c) (Count II) and Section 20(a) of the Exchange Act (Count III) against the Individual Defendants. Defendants move to have Counts I and II dismissed pursuant to Federal Rule Civil Procedure 12(b)(6).[3]

## DISCUSSION

### I.    Legal Standards

#### A.    Motions to Dismiss Pursuant to Rule 12(b)(6)

When considering a motion to dismiss pursuant to Rule 12(b)(6), "a court must construe the complaint in the light most favorable to the plaintiff and must accept all well-pleaded factual allegations as true." *Shwarz v. United States*, 234 F.3d 428, 435 (9th Cir. 2000). A court, however, is "not bound to accept as true a legal conclusion couched as a factual allegation." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Dismissal under Rule 12(b)(6) may be "based on the lack

---

[3] Defendants ask the Court to dismiss Plaintiff's Amended Complaint, but Defendants' motion does not assert any arguments against Count III. Because Count III is not addressed in the briefing the Court declines to consider its dismissal.

of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).

### B. Pleading Standard for Securities Fraud Claims

Securities fraud claims must satisfy the dual pleading requirements of Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *Zucco Partners, LLC v. Digimarc Corp*., 552 F.3d 981, 990 (9th Cir. 2009). Under Rule 9(b)'s heightened pleading requirement, "a party must state with particularity the circumstances constituting fraud." This standard is satisfied if a pleading identifies "the who, what, when, where, and how of the misconduct charged, as well as what is false or misleading about the purportedly fraudulent statement, and why it is false." *Cafasso v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1055 (9th Cir. 2011) (internal quotation marks and brackets omitted).

The PSLRA requires "that a complaint plead with particularity both falsity and scienter." *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001). A complaint must "specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). To qualify as "strong" under this statute, "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd*., 551 U.S. 308, 314 (2007).

## II. Analysis

### A. Defendants Taronis and Mahoney

To state a claim under Section 10(b) and Rule 10b-5, Plaintiffs must show with particularity (1) a material misrepresentation or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341–42 (2005). Defendants assert that Plaintiffs have failed to adequately plead a material misrepresentation, scienter, and loss causation.

### 1. Material Misrepresentation

Defendants claim that Plaintiffs have failed to allege a material misrepresentation or omission of material fact with respect to the Press Release because Taronis did have a contract with the City. Defendants explain, as they did in their February 12 Form 8-K/A, that they had a purchase order from the City,[4] and under basic contract law, purchase orders submitted after the purchaser received a quote are contracts.

However, "a statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exits." *Berson v Applied Signal Technology, Inc.*, 527 F.3d 982, 985 (9th Cir. 2008) (internal quotes and citations omitted). "[A] statement that is literally true can be misleading and thus actionable under the securities laws." *Brody v Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002). Thus, Defendants' argument that they technically had a contract is not dispositive.

Plaintiffs have adequately alleged that the Press Release was misleading because it gave reasonable investors the false impression that Taronis had secured a long-term contract with the City. The language of the Press Release that the City had "elected to use MagneGas as its metal cutting fuel of choice" considered in conjunction with the reference to a newly formed contract may create in the minds of a reasonable juror the impression of a durable long-term, majority-type relationship. The City's alleged response to the Press Release further supports this interpretation. Plaintiffs assert that the City promptly requested the Press Release be removed due to its inaccuracy and that Defendants complied with the City's request. Plaintiffs also alleged the contents of internal City emails commenting on the Press Release's falsity. While, as Defendant argues, these allegations may not prove falsity, that is not the question before the Court. When the facts alleged are assumed to be true, the City's reaction to the Press Release supports the inference that the

---

[4] Plaintiffs contest whether Defendants had secured a purchase order at the time of the Press Release. Because the Court is required to construe all facts in favor of Plaintiffs on a motion to dismiss, the Court is not assuming the truth of Defendants' assertion. The Court is merely illustrating that even if Defendants had a purchase order, Plaintiffs have still alleged that the Press Release was misleading under Section 10(b).

Press Release gave reasonable investors the impression that Taronis had a more significant agreement with the City than an "approval and a written authorization . . . to move forward with the procurement of gas." (Doc. 45 at 7.) Plaintiffs have sufficiently alleged a material misrepresentation under Section 10(b) and Rule 10b-5.

### 2. Scienter

A defendant acts with scienter for purposes of Section 10(b) and Rule 10b-5 if he acts with "intent to deceive, manipulate, or defraud" or with "deliberate recklessness." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc*., 856 F.3d 605, 619 (9th Cir. 2017). "[D]eliberate recklessness is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (alterations in original) (internal quotations omitted). General facts demonstrating motive and opportunity are not sufficient. *Id.* To be a "strong" inference, as required by the PSLRA, the inference of scienter must be "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs,* 551 U.S. at 314.

In this Circuit there is a dual inquiry to determine the sufficiency of a plaintiff's scienter pleadings. First, the court must determine "whether any of the allegations standing alone, are sufficient to create a strong inference of scienter." *Dearborn Heights*, 856 F.3d at 620 (quoting *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.2d 1089, 1095 (9th Cir. 2011)). "[I]f no individual allegation is sufficient, we conduct a 'holistic' review of the same allegations to determine whether the insufficient allegations combine to create a strong inference of intentional conduct or deliberate recklessness." *Id.* (alterations in original). However, where, as here, "falsity and scienter are 'strongly inferred from the same set of facts,' we may 'incorporate[ ] the dual pleading requirements of 15 U.S.C. §§ 78u-4(b)(1) and (b)(2) into a single inquiry,' asking 'whether particular facts in the complaint, taken as a whole, raise a strong inference that defendants intentional or [with] deliberate recklessness made false or misleading statements to investors.'" *In re Allied Nevada Gold Corp. Securities Litigation*, 743 F. App'x 887 (9th Cir. 2018) (alterations in

original) (quoting *Ronconi v. Larkin*, 253 F.3d 423, 429 (9th Cir. 2001)).

Defendants assert Plaintiffs allege "little more than . . . general corporate motive and opportunity, which courts routinely reject." (Doc 45 at 17.) However, in support of its theory that Defendants acted with knowledge, intent, or deliberate recklessness in making and disseminating misleading statements in the Press Release, Plaintiffs allege that Defendants knew the contents of the Press Release were false or misleading; Defendants received an email, on January 29, from the City of San Diego (the purported counter-party to the contract) asking for the Press Release to be "immediately removed[d]" because the city did "not have any procurement contract or any agreement with [Defendants]." (Doc. 36 at 15); Defendants did not issue a corrective statement about the Press Release until February 12; and, that motive and opportunity for fraud are also evident because Defendants were working to maintain the Company's listing on NASDAQ.

Thus, contrary to Defendants' assertions, Plaintiffs' allegation of scienter is based on more than a general allegation of motive and opportunity. While Defendants claim they innocently believed the Press Release was true and had no motive to mislead investors in light of the approved reverse stock split, the facts alleged give rise to an inference that Defendants intentionally or with deliberate recklessness made false or misleading statements to investors. Plaintiffs have adequately alleged scienter.

### 3. Loss Causation

"To prove loss causation, the plaintiff must demonstrate a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered by the plaintiff." *Curry v. Yelp Inc.*, 875 F.3d 1219, 1225 (9th Cir. 2017) (quoting *Ambassador Hotel Co., Ltd. v. Wei–Chuan Inv.,* 189 F.3d 1017, 1027 (9th Cir. 1999)). "This inquiry requires no more than the familiar test for proximate cause." *Mineworkers Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018). In the securities fraud context, "[t]he burden of pleading loss causation is typically satisfied by allegations that the defendant revealed the truth through corrective disclosures which caused the company's stock price to drop and investors to lose money." *Lloyd v. CVB*

*Financial Corp.*, 811 F.3d 1200, 1209 (9th Cir. 2016) (internal quotations omitted). A causation theory based on revelation of the fraud is not the only means of establishing loss causation. *First Solar*, 881 F.3d at 754 ("[T[here are an 'infinite variety' of ways for a tort to cause a loss."). However, when the complaint relies on a revelation theory of loss causation, allegations relying on the mere risk or potential for fraud are insufficient. *Curry*, 875 F.3d at 1225.

Defendant first argues that the FAC improperly alleges that the mere risk or potential for fraud caused Plaintiffs claimed loss. The Ninth Circuit has consistently held that when the purported theory of loss causation is based on the market's revelation of the alleged fraud "the mere announcement of an investigation" or some other analogous event "is insufficient to establish loss causation because it does not reveal fraudulent practices to the market." *Curry*, 875 F.3d at 1225 (citing *Loos v. Immersion, Corp*., 762 F.3d 880, 890 (9th Cir. 2014)). The Ninth Circuit, however, recently held that a viable loss causation theory can be based on such an event "if the complaint also alleges a subsequent corrective disclosure by the defendant." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016).

In *Lloyd*, the defendant's largest borrower informed defendant it would be unable to make its payments and was contemplating bankruptcy. *Id.* at 1202. The defendant nonetheless represented that there was no basis for serious doubt about the debtor's ability to repay its borrowings. *Id.* The defendant was later served a subpoena from the SEC seeking information about its loan underwriting methodology and allowance for credit losses. *Id.* The day after the defendant announced its receipt of the subpoena, its stock dropped over 20%. *Id.* A month later, the defendant announced that the debtor was unable to repay its loans. *Id.* In response, the stock price dropped less than one percent. *Id.* at 1205.

The complaint in *Lloyd*, asserting violations of Section 10(b) and Rule10b-5, alleged that (1) the announcement of the subpoena caused the defendant's stock price to drop precipitously; (2) the market perceived the subpoena to be related to the defendant's alleged misstatements about the debtor's ability to pay; (3) the market's fears about the subpoena

were confirmed by a subsequent disclosure; and (4) the subsequent disclosure's minimal effect on the defendant's stock price indicated that the previous substantial drop reflected, at least in part, the market's concerns about the alleged misstatements. *Id.* at 1210–11. Based on these allegations, the court concluded that the plaintiff had "adequately pleaded a causal connection between the material misrepresentation and the loss." *Id.* at 1211.

The FAC closely resembles the complaint in *Lloyd*. It alleges that (1) market uncertainty about the existence of a contract resulting from Taronis's removal of the Press Release from its website led to the decline in Taronis's stock price; (2) the market perceived the removal of the Press Release to be related to its contents, i.e. Taronis's relationship with San Diego; (3) the market's fears about the disappearance of the Press Release were confirmed when the alleged fraud was "fully and finally revealed" by the February 12 announcement; and (4) the February 12 announcement had a minimal effect on Taronis's stock price. Thus, contrary to Defendant's assertion, the FAC does not rely on the market's speculation of fraud derived from the removal of the Press Release alone. Plaintiffs theory of a "slow leak" revelation is nuanced, but this Circuit has recognized that there are an infinite number of ways to allege loss causation. *First Solar*, 881 F.3d at 754. The allegations in the FAC, viewed together, adequately allege a viable loss causation theory. *C.f. Loos*, 762 F.3d at 890 (holding that the complaint's omission of two subsequent disclosures confirming the market's fears of fraud was "fatal to [plaintiff's] ability to plausibly allege loss causation).[5]

---

[5] Defendant also argues that Plaintiffs' loss causation theory must fail because the timing of the drop in Taronis's stock value more aptly lines up with the announcement and execution of the reverse stock split. However, the Court is not presently tasked with determining the actual cause of Plaintiffs claimed loss. When the facts alleged in the complaint are assumed to be true, Plaintiffs have adequately pleaded a causal connection between the material misrepresentation and the loss. *See Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1062 (9th Cir. 2008) ("A plaintiff does not, of course, need to prove loss causation in order to avoid dismissal; but the plaintiff must properly allege it."); *see also In re Impinj, Inc., Sec. Litig.*, 414 F. Supp. 3d 1327, 1337 (W.D. Wash. 2019) ("Plaintiffs have the burden of showing that the misrepresentation was a substantial cause of the loss, but need not show that it was the sole reason for a drop in share price.") (citing *Nuveen Mun. High Income Opportunity Fund v. City of Alameda.*, 730 F.3d 1111, 1119 (9th Cir. 2013)).

## B.     Individual Defendants

The FAC fails to state a claim against the Individual Defendants for violations of Rule 10b-5(a) and (c). "To state a claim under Rule 10b–5(a) and/or (c), a private plaintiff must allege facts showing (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud [in connection with the purchase or sale of securities], (3) with scienter, [ ] (4) reliance[,] (5) economic loss, and (6) loss causation." *In re CytRx Corp. Sec. Litig.*, No. CV14-1956GHK(PJWX), 2015 WL 5031232 (C.D. Cal. July 13, 2015) (internal quotations omitted). The facts alleged to support a Rule 10b-5(a) or (c) claim, however, cannot be the same facts that form the basis of a Rule 10b-5(b) claim. *WPP Luxembourg Gamma Three Sarl v. Spot Runner, Inc.,* 655 F.3d 1039, 1058 (9th Cir. 2011) ("A defendant may only be liable as part of a fraudulent scheme based upon misrepresentations and omissions under Rules 10b–5(a) or (c) when the scheme also encompasses conduct beyond those misrepresentations or omissions.").

Here, the FAC does not allege any facts that are separate from those already alleged in the Rule 10b-5(b) claim. Plaintiffs merely add that the Individual Defendants "participated in the scheme to defraud" by participating in the issuance of the Press Release and in the decision to delay issuing a corrective disclosure. This is not enough. *C.f. In re CytRx Corp. Sec. Litig.,* No. 14-cv-1956, 2015 WL 5031232, at \*12 (C.D. Cal. July 13, 2015) (holding that a complaint alleged a Rule 10b-5(a) or (c) claim when, in addition to the misrepresentation that was the basis for the Rule 10b-5(b) claim, the complaint also "included conduct beyond said statements, including the hiring of promoters, planning and editing well-timed article releases with targeted content to artificially inflate the value of company stock and raise revenue, and covering up the Company's involvement."); *Rabkin v. Lion Biotechnologies, Inc.*, No. CV 14-1956-GHK (PJWx), 2018 WL 905862, at \*16-17 (N.D. Cal Feb. 15, 2018) (similar); *In re Galena Biopharma, Inc. Sec. Litig.*, 117 F. Supp. 3d 1154, 1166–67 (D. Or. 2015) (similar). Plaintiffs' Rule 10b-5(a) and (c) claim against the Individual Defendants (Count II) is dismissed.[6]

---

[6] The Individual Defendants remain subject to this action under Count III.

**CONCLUSION**

The FAC adequately pleads a violation of Section 10(b) and Rule 10b-5 against Defendant Taronis and Defendant Mahoney. However, the FAC falls short with respect to its Rule10b-5(a) & (c) claim asserted against the Individual Defendants. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss First Amended Class Action Complaint (Doc. 45) is **GRANTED** in part and **DENIED** in part. Defendant's Motion to Dismiss with respect to Count I is **denied**. Defendant's Motion to Dismiss with respect to Count II is **granted**.

Dated this 8th day of April, 2020.

G. Murray Snow
Chief United States District Judge